ALDEN-ROCHELLE, Inc., et al. v. AMERICAN SOC. OF COMPOSERS, AUTHORS AND PUBLISHERS et al.

United States District Court
S. D. New York.

July 19, 1948.

See also, D.C., 3 F.R.D. 157.

Weisman, Celler, Quinn, Allen & Spett, Milton Weisman, and Adolph Kaufman, all of New York City, for plaintiffs.

Gilbert & Gilbert, Francis Gilbert and Godfrey Cohen, all of New York City, for defendant Gustave Schirmer.

Schwartz & Frohlich and Louis Frohlich, all of New York City, for defendant ASCAP.

Bogle, Bogle & Gates, of Seattle, Wash., for Pacific Coast Conference of Independent Theatre Owners, amicus curiae.

LEIBELL, District Judge.

Two claims are asserted in this suit by each of the 164 plaintiffs who operate 200 motion picture theatres. Both claims are based on violations of the Federal anti-trust laws by the American Society of Composers, Authors and Publishers (Ascap) and its members and officers. The first claim is a private right of action for treble damages, which is specifically conferred by statute [Title 15 U.S.C.A. § 15] on any one who has been injured in his property or business by conduct of another which violates the provisions of the anti-trust laws. The second claim is a suit for injunctive relief [Title 15 U.S.C.A. § 26] against threatened loss or damage by a violation of the anti-trust laws.

The complaint was filed in this Court on April 9, 1942. Between July 1943 and August 1946 the litigation was dormant. A pre-trial hearing was had before Judge Knox in December 1947, and an order was made after the hearing which was very helpful when the case was tried early in March 1948. Counsel filed their briefs and proposed findings of fact and conclusions of law late in April. After reviewing the record, considering the arguments of counsel and the cases cited in their briefs, I have concluded that Ascap has violated the anti-trust laws, but that plaintiffs have failed to prove that they have been injured thereby and have sustained damages. Plaintiffs have shown, however, that the power which Ascap has acquired in violation of the anti-trust laws and which Ascap attempted to use in August 1947 in a way that would have increased, many times, the license fees charged exhibitors for the right to perform publicly for profit musical compositions synchronized on films, is a constant threat which may cause loss or damage to the plaintiffs and plaintiffs are entitled to an injunction. The court's findings of fact and conclusions of law are being filed herewith. For a complete understanding of the factual situation, referred to only generally in this opinion, the findings of fact should be consulted.

[1] § 1 of the Copyright Law (Title 17 U.S.C.A. § 1) enumerates the exclusive rights which a person who owns a copyrighted work receives under the statute,

including the right [§ 1(e)] "to perform the copyrighted work publicly for profit if it be a musical composition and for the purpose of public performance for profit; and for the purposes set forth in subsection (a) hereof [to print, reprint, publish, copy and vend the copyrighted work], to make any arrangement or setting of it or of the melody of it in any system of arrangement or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced." In Buck v. Jewell-LaSalle Realty Co., 1931, 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971, 76 A.L.R. 1266, Mr. Justice Brandeis held that the acts of a hotel proprietor, in making available to his guests, through the instrumentality of a radio receiving set and loud speakers installed in his hotel and under his control and for the entertainment of his guests, the hearing of a copyrighted musical composition which had been broadcast from a radio transmitting station, constituted a performance of the composition within the meaning of the act, even though no detailed choice of selections was given to the hotel proprietor who had to accept whatever program was transmitted. "Intention to infringe is not essential under the Act."

### Origin and Activities of Ascap.

The defendant Ascap is a voluntary association which was organized in 1914 for the purpose of licensing the public performance of musical compositions, of which its members owned the copyrights. Acting alone, the individual authors and composers were unable to detect infringement of their copyrights by those who performed their compositions publicly for profit. Even the corporate publishers of musical compositions could not do so. It was felt that an organization, with branches throughout the United States, could "police" the public performances of musical compositions by bands and orchestras, in hotels, theatres and places of amusement. If infringements were detected, Ascap would endeavor to get the infringer to take a blanket license covering all the works of Ascap's members, for a reasonable annual fee; and if the infringer refused to take a license, Ascap would have a suit filed for infringement.

So that Ascap might act for all its members most effectively, each member assigned to Ascap the non-dramatic performing rights of his copyrighted musical compositions. The sums that Ascap collected were kept in a common fund and a division of the proceeds, less expenses, was made at regular intervals. The division was one-half to the publisher members, and one half to the composer and author members.

Ascap is governed by a board of directors of 24 members. Prior to 1941 they were self-perpetuating, but since then 12 members are selected by the publishers and 12 by the composers and authors. The 12 who represent the publishers determine how the publishers share of the fund shall be divided among the publishers; the 12 directors who represent the composers and authors perform a like service in allotting their respective shares to the composers and authors. From their determination there is a right of appeal to a Board of Appeal; and from its decision an appeal may be taken to the full board of directors.

The division of the publishers share among the publisher members is based upon the popularity, earning capacity, seniority and the number and quality of the compositions in a publisher member's catalog. Popularity or vogue is determined by a survey of the compositions played over certain broadcasting chains in a given period.

The composers and authors are classified into a number of groups and grades, 19 in all. Many elements are considered in fixing a composer's classification. Length of membership, quality of compositions, popularity or vogue, earning power for the Society and the like, are duly weighed and the classification determined in the manner provided by the Articles of Association.

When silent pictures were shown in theatres the music was supplied either by a piano player or by an orchestra, which varied in size according to the size and importance of the theatre. The theatre owners refused to pay any royalties or license fee for performing the musical compositions played in the theatres. Ascap brought a number of suits for infringement. In

1923 theatre owners took a blanket license for each theatre and paid Ascap an annual fee based on seating capacity. The form of the license and the fees paid were the result of negotiations between Ascap and trade organizations of theatre operators.

When motion pictures with sound were introduced in 1928, new problems were presented to Ascap and its members. The so-called "talkies" showed the action of the members of the cast and reproduced their speech. Music was employed as part of the background for some of the scenes. At first the sound part of talkies was recorded on phonograph discs which were so operated that they synchronized with the pictures projected on the screen. Later, the speech of the actors, the music and sound effects, were recorded on the "sound track" of the film, which paralleled the pictures, so that when the pictures were projected on the screen the sound was heard by the audience. The Columbia Encyclopedia explains this as follows: "The sound track method (now commonly used)" is one "by which the sound is recorded on a strip of sound cells attached to the film itself and projected with the aid of the photo-electric cell." The development and application of this invention are described as follows: "In 1926 the first successful efforts were made to add sound to sight; in 1927 sound effects and bad music gave way to steadily improving spoken dialogue, and 'The Jazz Singer' with the well known Al Jolson, made a sensation with its spoken sequence; in 1928 the first all talking picture, 'The Lights of New York' appeared."

After the introduction of music on films, motion picture producers began acquiring the catalogs of music publishers, many of them members of Ascap. Ascap's writer members were requested by producers, as the need arose, to license the recording of specific musical compositions on films. From all of this the following arrangements evolved. A member of Ascap, on request, licensed a motion picture producer to record, i. e. to synchronize his musical compositions on the film, but expressly excepted the performing rights of the musical composition. Motion picture producers rented their films to the exhibitors (theatre operators) with a provision in the contract that the film would be exhibited only in a theatre for which Ascap had issued a license to perform publicly for profit the musical composition of Ascap's members. The exhibitor in order to show the film had to obtain a license from Ascap. His contract with the producer barred him from altering or deleting any part of the rented film. Licenses were issued by Ascap to exhibitors in blanket form, good for at least one year, and covering all music of which Ascap held the performing rights. The license fee was based on the seating capacity of the theatre. The charge per theatre per annum was very reasonable. On the basis of 25 compositions per film and 6 shows a day for every day in the year, the charge averaged about one mill per musical composition performance in a 500 seat house. The form of the license, which was in effect during the period in suit, was worked out at conferences of various organizations representing the exhibitors with representatives of Ascap in 1933 and 1934. Over 17,000 motion picture theatres have been licensed by Ascap. Ascap has also issued about 13,000 licenses covering the performing rights of the copyrighted music of its members to hotels and places of entertainment.

The motion picture producers through their ownership of a number of music publishing corporations who were members of Ascap, shared in the funds collected by Ascap from all sources, including the licensing of motion picture theatres. The producer publishers drew down 37% of the 50% of the net proceeds of Ascap's licenses, allotted to publisher members by Ascap. For the 10 years of 1937 to 1947 the total amount of Ascap's annual distributions varied between three million and seven million dollars. Almost every film contained some Ascap music and frequently the majority of the musical compositions on a film were Ascap music. The motion picture producers employed talented composers to write the background music for their motion pictures. These musical compositions were never printed and sold, but as a rule they became the property of the producer's music publishing subsidiary. The Ascap catalog, including foreign socie-

ties for which Ascap has acted, is estimated to include a million musical compositions.

A "per piece" license would be commercially impracticable. Exhibitors frequently contract for films before they are produced. The "cue sheets" for the film are made available when the picture is released for exhibition purposes. They list the musical compositions included in the picture. The extra labor and great expense of getting "per piece" licenses for the musical compositions on a film is evident when we consider the film needs of an average neighborhood house, which exhibits two double feature shows weekly. Each feature contains parts or selections from about 20 musical compositions. 80% of the musical compositions on films is Ascap music. That would require 64 "per piece" licenses a week, not including licenses for music which is used on newsreels and short subjects. Exhibitors naturally prefer a blanket license good for a year, covering all musical compositions controlled by Ascap. For a "per piece" license Ascap charges $10.00, plus. For a yearly blanket license the cost to the average neighborhood theatre is less than $100. Not a single theatre ever requested a "per piece" license from Ascap.

The motion picture producer, when he obtains from an Ascap member the right to record his musical composition on the film, bargains for that right only and does not obtain the right to perform publicly for profit the composition thus recorded. The producer may pay as little as a few hundred dollars or, in rare cases, as much as $25,000 for the right to record the musical composition—the right to synchronize it with the picture on the film. When the producer acquires that right from one who is not a member of Ascap he insists upon buying also the right to perform the musical composition publicly for profit. The exhibitors complain that the producer should follow the same course when he acquires the film recording rights from a member of Ascap. If he did so, then the exhibitors would not need any license from Ascap.

The producer does not acquire the performing rights from Ascap members, because they are prohibited by their arrangement with Ascap from licensing the performing rights to motion picture producers. The major producers also have a financial interest in the license fees Ascap collects, because those producers own music publishing corporations which are publisher members of Ascap, and thus they share in the one half of Ascap's net receipts which are allotted to the publisher members.

### Ascap's Violation of the Anti-Trust Laws

██ Almost every part of the Ascap structure, almost all of Ascap's activities in licensing motion picture theatres, involve a violation of the anti-trust laws. Although each member of Ascap is granted by the copyright law a monopoly in the copyrighted work, it is unlawful for the owners of a number of copyrighted works to combine their copyrights by any agreement or arrangement, even if it is for the purpose of thereby better preserving their property rights. Straus v. Amer. Publishers Assoc., 231 U.S. 222, 34 S.Ct. 84, 58 L.Ed. 192, L.R.A.1915A, 1099; Ring v. Spina, 2 Cir., 148 F.2d 647; Watson v. Buck, 313 U.S. 387 at page 404, 61 S.Ct. 962, 85 L.Ed. 1416; Interstate Circuit Inc. v. U. S., 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610. The result of such a combination "is to add to the monopoly of the copyright in violation of the principle of the patent cases involving tying clauses." U. S. v. Paramount Pictures, 68 S.Ct. 915, 929.

██ That Ascap is a monopoly, within the language of § 2 of the anti-trust laws, was clearly established at the trial. In United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416 at page 424 the court expressed the view that a ninety percent share of the market was enough to constitute a monopoly although it was "doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three percent is not." In the same case Judge Learned Hand held that "In order to fall within § 2 (of the Sherman anti-trust act) the monopolist must have both the power to monopolize, and the intent to monopolize. * * * 'Alcoa' meant to keep, and did keep, that complete and exclusive hold upon the ingot market with which it started. That was to 'monopolize'

894

that market, however innocently it other-wise proceeded." In the case at bar it was shown that Ascap in the course of 34 years has built up a monopoly of the music that is used in the production of motion pictures, and in so doing it has violated § 2 of the anti-trust laws. "The authorities support the view that the material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded but that power exists to raise the prices or to exclude competition when it is desired to do so." American Tobacco Co. v. U. S., 328 U.S. 781 at page 811, 66 S.Ct. 1125, at page 1139, 90 L.Ed. 1575. Ascap has that power.

The combination of the members of Ascap in transferring all their non-dramatic performing rights to Ascap, is a combination in restraint of interstate trade and commerce, which is prohibited by § 1 of the anti-trust laws. It restrains competition among the members of Ascap in marketing the performing rights of their copyrighted works. And by barring a member from assigning the performing rights to the motion picture producer at the same time that the recording right is assigned, the channels in which the films may be marketed is narrowed to those exhibitors who have a license from Ascap covering the performing rights of the Ascap music synchronized on the film. That result is accomplished through an unlawful combination with the motion picture producers in violation of § 1 of the anti-trust laws. The arrangement by which the producers consent that there be specifically reserved to Ascap the right to license the performing rights, is supplemented by a provision in the contract between the distributor of the motion pictures and the exhibitors which limits the public exhibition of the film for profit to theatres which have an Ascap license. The producers and Ascap's members thus combine the monopoly of the copyright of the motion picture with the monopoly of the copyright of the musical compositions, which constitutes an unlawful extension of the statutory monopoly of each and violates the anti-trust laws, as a combination in restraint of trade.

 The fact that Ascap is a membership association gives it no immunity. "Ar-rangements or combinations designed to stifle, competition cannot be immunized by adopting a membership device accomplishing that purpose". Associated Press v. United States, 326 U.S. 1 at page 19, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013. Nor is Ascap shielded by its purpose to prevent the infringement of the copyright of its members. The purpose of the Fashion Guild to prevent "style piracy," i. e. the copying of "original creations," did not take it outside the scope of the anti-trust laws. Fashion Guild v. Trade Comm'n, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949. "The necessities or conveniences of a patentee do not justify any use of the monopoly of the patent to create another monopoly." Mercoid Corp. v. Mid-Continent Co., 320 U.S. 661 at page 681, 64 S.Ct. 268, at page 271, 88 L.Ed. 376.

Many of the cases which have held that patent owners may not combine their patents so as to extend the monopoly of the one patent by the monopoly of the other, state the legal principles which prevent two copyright owners from doing a similar thing. The leading cases, which hold that such a combination of patents constitutes an illegal restraint of interstate commerce, are reviewed in a recent decision, United States v. Line Material Co., et al., 333 U.S. 287, 68 S.Ct. 550. There Mr. Justice Reed wrote for the Court as follows, 333 U.S. page 315, 68 S.Ct. at page 564:

"The mere fact that a patentee uses his patent as a whole or part consideration in a contract by which he and another or other patentees in the same patent field arrange for the practice of any patent involved in such a way that royalties or other earnings or benefit from the patent or patents are shared among the patentees, parties to the agreement, subjects that contract to the prohibitions of the Sherman Act whenever the selling price, for things produced under a patent involved, is fixed by the contract or a license, authorized by the contract."

The combination of the authors, composers and publishers in the Ascap organization, their obligations to the association, the rights they conferred on Ascap and

the reservations they made in their arrangements with the motion picture producers, have given Ascap the power to fix the prices at which the performing rights are sold to the exhibitors. The members share in the license fees collected through the unlawful combination. By pooling their rights and pooling the license fees derived therefrom, each in some way shares in the copyrighted work of the others. This has all the evils of "block booking" which was analyzed and condemned in U. S. v. Paramount Pictures, D.C., 66 F. Supp. 323 at pages 348-349; and in the opinion of the U. S. Supreme Court May 3, 1948.

That Ascap was moderate in its demands in 1934 and considerate in the prices it fixed after negotiation with the exhibitors, does not detract from the fact that as a monopoly Ascap had the power to increase those prices to an unreasonable figure by demanding higher license fees, to the financial gain of its members. Ascap showed to what extent that power could be exercised when in August 1947 it attempted to increase the license fees as much as 200% to 1500%. This price fixing power coupled with the combination of the members copyrights constitutes an unlawful restraint of trade.

■ Where the power to fix prices is created by an agreement among those who control a substantial part of an industry and who should do business on a competitive basis in a free market, the reasonableness of the prices or the good intentions of the combining units would not absolve them from the charge that they have violated the anti-trust laws. United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 379, 71 L.Ed. 700, 50 A.L.R. 989. In the Trenton Potteries case the court said: "The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. * * * Agreements which create such potential power may well be held to be in themselves unreasonable or unlawful restraints, without the necessity of minute inquiry whether a particular price is reasonable or unreasonable as fixed." The above was quoted in the opinion of Mr.

Justice Douglas in U. S. v. Socony-Vacuum Oil Co., 310 U.S. 150 at page 213, 60 S.Ct. 811, 84 L.Ed. 1129. See also Ethyl Gasoline Corp. v. U. S., 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852.

### Damages.

The right to perform a copyrighted musical composition publicly for profit has some intrinsic value. It is one of the rights that a copyright owner receives under § 1(e) of the Copyright Law. As the result of negotiations in 1933–34, Ascap and the exhibitors who acted through their trade organizations, arrived at a schedule of rates which were very reasonable and were based on the seating capacity of the theatre operated by the exhibitor. The contract was a blanket contract covering all Ascap music on films shown at the theatre.

In 1947 Ascap tried to increase those rates, using one filled capacity house at the highest established admission prices as the annual charge for the license. This new proposed rate, when applied to some theatres, meant an increase of 1500%; for other theatres the increase was about 200%. The exhibitors protested and a new set of rates, based on the old formula of a per seat basis, was approved. This resulted in an average increase of about 25% or 30% over the old 1934 rates, the increase to be effective as of March 1948.

■ At the trial, plaintiffs did not attempt to prove that the 1934 rates, which cover the period of this suit, were excessive. Nor did plaintiffs attempt to prove what a proper rate would be. Plaintiffs' position was that they should not have been obliged to obtain a license for the public performance rights from Ascap; that the copyright owner of the musical compositions when he sold the synchronization rights to the motion picture producer should have included the public performance rights in the deal; and that if that course had been followed the exhibitor would not have been required to pay anything more to the producer than he pays as the rental for the film. Plaintiffs argue that copyright owners who are not members of Ascap include the public performing rights when they license a motion

picture producer to record a musical composition on a film; and that the producer does not have to pay the copyright owner any additional amount for the performing rights of the musical composition. The second half of this statement is disproved by the testimony of Harry Fox.

The acquisition of the synchronization rights from the copyright owners of musical compositions is generally arranged by Mr. Fox, who has operated an agency for that purpose since 1937. He testified that when he is asked by a producer to obtain the rights for a musical composition which is to be incorporated in a motion picture he gets in touch with the owner of the copyright. Apparently he has the records and the organization to do that work. If the copyright of the musical production is owned by a person who is not a member of Ascap, Fox tells the owner that both the synchronization rights and the right to publicly perform the music on the film are to be acquired by the producer. When the producer wants the performance rights as well as synchronization rights, the figure is a litle higher. There is no separate figure fixed for the performance rights and another figure for the synchronization rights, in making the deal. Fox tells the copyright owner that he has to include the right to perform with the synchronization rights; and the owner of the copyright usually takes that into consideration in fixing a lump sum price. In most cases the owners consider the performance rights as having some value.

If the owner of the copyright is a member of Ascap, Mr. Fox does not include the performance rights in acquiring the synchronization rights for the producer. The producers know, of course, that the performing rights have a value distinct from the synchronization rights, because of their ownership of music publishing corporations, which are members of Ascap, and through which the producers derive considerable revenue from Ascap's separate licensing of the performance rights to the exhibitors. If the producer lost that source of revenue and also had to pay the copyright owner for the performing rights, the producer would try to pass that extra cost on to the exhibitor. Mr. Brandt who operates 73 of plaintiffs' theatres, admitted that the producer might use this as another argument to get increased rentals; but he expressed the opinion that if the exhibitor did not have to pay a license fee for the performing rights, he would not have to pay any increased film rental to the producer. Brandt based his belief on his feeling that the exhibitors were already paying as much as they could carry. But the load the exhibitors carry includes the amount they pay to Ascap. It is not at all likely that the producers would absorb the cost of the performing rights.

Unquestionably it would be a simpler and a proper arrangement for the owner of the copyright to deal directly with the producer on both the synchronization rights and the performing rights, and thus have the motion picture producer acquire both rights at the same time, so that he in turn could rent the film without requiring the exhibitor to obtain the performance rights from Ascap. But that in some way the value of the performing rights would be claimed by the copyright owner and eventually would be passed on to the exhibitor, I have no doubt at all. The ultimate result would be that the exhibitor would not be separately charged for the performance rights, as he now is through Ascap, but he would be charged for those rights in the total rental he would pay for the film.

The charges made the exhibitor for the performing rights in the formula used from 1934–1947 were in my opinion fair and reasonable. The license fee negotiations were between the two organized groups; Ascap on the one hand and the exhibitors' trade associations on the other. The amount charged was paid, year after year, for 13 years, although the contracts contained 30 day cancellation clauses. Plaintiffs submitted no proof that the performing rights were worth any less than the amount charged under the blanket contract of Ascap. I am satisfied that plaintiffs were not injured by Ascap's violations of the anti-trust laws for the period covered by this lawsuit.

■ Even if the court should presume injury to plaintiffs from Ascap's violations of the statute, there would still be no evidence before this court on which it could approximate plaintiffs' damages. Plaintiffs got something under the Ascap contracts. What they got, the performing rights, had some value. Plaintiffs admit that a copyright owner could separately grant the performing rights. The exhibitors themselves agreed with Ascap as to what their value was. Plaintiffs can not recover unless they were led to pay "more than the worth" of the performing rights. Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241. They must show that they were injured. Twin Ports Oil Co. v. Pure Oil Co., 8 Cir., 119 F.2d 747; Northwestern Oil Co. v. Socony Vacuum Co., 7 Cir., 138 F.2d 967.

■ To apply the principle of forfeiture plus a 200% penalty, for which plaintiffs in effect contend, would be to go far beyond any sanctions the Supreme Court has approved in a private right of action for a violation of the anti-trust laws. The anti-trust laws have been liberally construed. In prosecutions and civil proceedings instituted by the government, the Supreme Court has condemned monopolies and contracts and combinations in restraint of trade. In suits on a private right of action brought by a person claiming that he has been injured by another's violations of the anti-trust laws, the high court has applied a very liberal rule as to the quantum of proof on the issue of damages and has held that the amount thereof need only be approximated, although they should not be the subject of speculation or guesswork. Bigelow v. R.K.O. Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652. In the case at bar there is no evidence which affords a sufficient basis for approximating plaintiffs' damages, assuming plaintiffs have been injured. No standards of comparison are given to determine if there was any overcharge. No experts were called on the question of the value of the performing rights. Sheldon v. Metro Goldwyn Corp., 309 U.S. 390 at page 404, 60 S.Ct. 681, 84 L.Ed. 825. In the case at bar the judge is both court and jury. The same rules that should guide a jury in estimating damages should be followed by the judge. In Bigelow v. R.K.O. Radio Pictures, supra, 327 at page 264, 66 S.Ct. 574, 579, 90 L.Ed. 652, Chief Justice Stone wrote:

"In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly."

The Supreme Court in applying the equitable principle of "unclean hands" has ruled that the aid of the Court should be denied a holder of a patent in an infringement suit when he has misused his patent and has violated the anti-trust laws. The patent owner is barred from enforcing his patent rights, as long as he continues in his violation of the anti-trust laws. B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367; Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363. The Court has also recognized the right of the alleged infringer to counterclaim for damages, based on the private right of action section (§ 15) of the anti-trust laws. Mercoid Corp. v. Mid-Continent Co., 320 U.S. 661 at page 671, 64 S.Ct. 268, 88 L.Ed. 376. But there is no case that has come to my attention where it has been held that the licensee of a patent is entitled to recover back threefold from the owner of the patent the license fees or royalties he has paid, because the patent owner violated the anti-trust laws in his use of the patent.

Plaintiffs assert that the amount of their damages and the total of the license fees paid are the same, just as a matter of "coincidence." [1] They add that the "coincidence" is due to the fact (a further assumption on their part) that if they did not have to pay Ascap for the performing

---

[1] Plaintiffs have paid about $300,000 in license fees for the period in suit.

■

right they would not have to pay any one for them, and they would get the performing rights for nothing.

■ Plaintiffs also argue that since Ascap violated the anti-trust law, the license which Ascap granted to the exhibitor was illegal, that therefore the defendant Ascap was never entitled to collect any license fees, and further that the license fees represent the amount of plaintiffs' damages. This argument overlooks the fact that Ascap acquired legal title to the performing rights by assignment from each of Ascap's members. If Ascap had as such assignee collected for each member a "per piece" license fee for the performing rights, and in effect acted only as a collecting agency, there would have been no violation of the law. The blanket licenses were a violation of the anti-trust law and were issued pursuant to an illegal combination. Apart from the statute, the license agreements were not inherently vicious and unlawful. The license agreements were unenforcible because of their statutory illegality. The exhibitor got something of value and received what he paid for. The license fees paid were received on completed transactions.

Unless an exhibitor has been injured in his business or property by Ascap's violations no actionable wrong has been done to him. The conduct of Ascap may be a public wrong for which penalties and other remedies are afforded the government under the statute. But no private right of action arises unless a plaintiff is injured in his property or business by the' violations of Ascap. True, the cases hold that "The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done" and that "difficulty of ascertainment is no longer confused with right of recovery" Straus v. Victor Talking Mach. Co., 2 Cir., 297 F. 791, 802. "While the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate". Story Parchment Co. v. Paterson Co., 282 U.S. 555, 51 S.Ct. 248, 250, 75 L.Ed. 544. That relates to the damages flowing from the injury.

■ None of the cases hold that those who have paid a monopolist a price for its product, may claim that the extent of their damage is the full amount paid. The amount of any overcharge may be recovered, but the purchaser should offer some evidence from which the trial court may reasonably approximate the overcharge. The fact that the thing sold is something intangible, a right instead of merchandise, does not alter the requirement of the anti-trust laws that the plaintiff must show that he has been injured. The burden of proof is on plaintiff to show that part of his case by a fair preponderence of the evidence. When it comes to proving the extent of his damage the burden a plaintiff carries in an anti-trust action is lighter; all he need prove are the basic facts from which the court may reasonably approximate the amount of the damages. A plaintiff does not satisfy that burden by offering no proof at all, except what he paid the violator.

### Injunctive Relief.

■ The conduct of Ascap in notifying the theatre exhibitors in August 1947 that the rates for an Ascap license would be increased to such an extent that some theatres would be required to pay 15 times as much as the license fees under which they had been operating since 1934, is an indication of the power that Ascap has unlawfully acquired by its own arrangements with its members and by their arrangements with the motion picture producers. The threatened use of that power to demand unfair and exhorbitant license fees furnishes sufficient grounds for the exercise by the court of its ordinary equitable powers to prevent any threatened injury to plaintiffs. The Clayton Act, 15 U.S.C.A. § 26, "does not go farther in terms than to give an injunction to private persons against threatened loss." Mr. Justice Holmes in Fleitman v. Welsbach Co., 240 U.S. 27 at page 29, 36 S.Ct. 233, at page 234, 60 L.Ed. 505. To avail himself of § 26 a plaintiff must show threatened injury for which he is without adequate remedy and for which a court of

equity is able to provide a remedy. Dissenting opinion of Chief Justice Stone in Georgia v. Pennsylvania R. Co., 324 U.S. 439 at page 475, 65 S.Ct. 716, 89 L.Ed. 1051. The Clayton Act "gives to private parties a right to relief by injunction in any court of the United States against threatened loss or damage by a violation of the anti-trust laws, under the conditions and principles regulating the granting of such relief by courts of equity." Duplex Co. **v.** Deering, 254 U.S. 443 at pages 464, 465, 41 S.Ct. 172, at pages 176, 65 L.Ed. 349, 16 A.L.R. 196. It has been held that prior to the passage of the Clayton Act in 1914, "a private party could not maintain a suit for injunction" under the Sherman Act. Duplex Co. v. Deering, 254 U.S. 443, 465, 41 S.Ct. 172, 176, 65 L.Ed. 349, 16 A.L.R. 196.

In the case at bar Ascap and various groups or organizations of exhibitors in February 1948 arrived at a new set of rates which represented an average increase of 25% to 30% over the 1934 rates. The August 1947 demands were abandoned by Ascap. Plaintiffs have been offered the same type of contract (a long term contract) that other exhibitors accepted in February 1948. Does this remove the need for injunctive relief? I have concluded that it does not. Plaintiffs are entitled to have this court exercise its equitable powers to prevent a recurrence of what happened in August 1947 and to have their rights adjudicated and protected by a decree of the court, because the unlawful arrangements between Ascap and its members, and between the members and the motion picture producers, is a continuing one and is a clear violation of the anti-trust laws.

The Defense of "Unclean Hands."

 Defendants have pleaded as a special defense that a great number of the plaintiffs are themselves a monopoly and therefore are barred from equitable relief on the doctrine of "unclean hands". Brandt, who owns a majority interest in 53 theatres also buys films for 90 other theatres. The Supreme Court has condemned combinations of exhibitors and has pointed out the evil practices of such combinations and the unlawful advantages they, have been able to obtain through their practice of group buying. U. S. v. Crescent Amusement Co. et al., 323 U.S. 173, 174, 65 S.Ct. 254, 89 L.Ed. 160; U. S. v. L. C. Griffith et al., 68 S.Ct. 941 (decided by the Supreme Court May 3, 1948); Schine Chain Theatres, Inc., et al. v. U. S., 68 S.Ct. 947 (decided by the Supreme Court May 3, 1948). Brandt's testimony indicates that he has obtained some of those advantages. But the alleged anti-trust violations of a plaintiff in this case cannot properly be said to have an "immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." Equity applies the doctrine of unclean hands "only for such violations of conscience as in some measure affect the equitable relation between the parties in respect of something brought before the court for adjudication." Keystone Driller Co. v. Excavator Co., 290 U.S. 240 at page 245, 54 S.Ct. 146 at page 147, 78 L.Ed. 293. The methods employed by plaintiff exhibitors, who negotiated for the films with the distributors, are only remotely related to the issue in this litigation, which concerns the defendants' practices in licensing the exhibitors to perform publicly for profit the music that is synchronized on the film. The special defense of "unclean hands" is therefore dismissed.

### Attorneys' fees.

 I have concluded that plaintiffs have not shown any injury from defendants' violations of the anti-trust laws and that, even if we presume injury, plaintiffs have not proved any thing from which the court could approximate the damages. It follows that plaintiffs are not entitled to a money judgment and therefor cannot be awarded "a reasonable attorney's fee" under 15 U.S.C.A. § 15. "The court cannot properly award it except as an incident to the successful prosecution of a law action for recovery of damages based on a violation of the anti-trust laws." Allen Bradley Co. v. Local No. 3, D.C., 51 F.Supp. 36 at page 40. In Decorative Stone Co. v. Building Trades Council, 2 Cir., 23 F.2d 426, 428, it was held that "the allowance of an attorney's fee * * * is incidental to the statutory right to damages, and was properly denied in the equity proceedings," brought under 15 U.S.C.A. § 26. Even

though plaintiffs have made out a case for equitable relief under 15 U.S.C.A. § 26 they may not recover "a reasonable attorneys' fee" because they have failed to establish their claim for damages under 15 U.S.C.A. § 15.

Plaintiffs' claims for money damages and for a reasonable attorney's fee under § 15 are denied. Plaintiffs' claims for injunctive relief under § 26 are granted to the extent indicated in the Court's Conclusions of Law.[2] Settle a judgment and decree accordingly.

---

[2] "XXVII. Plaintiffs are entitled to injunctive relief under Title 15 U.S.C.A. § 26, as follows:

(a) Directing ASCAP to divest itself with all reasonable speed of all rights of public performance for profit through the exhibition of motion picture films, of musical compositions which have been synchronized with motion picture films, and to assign said performance rights to the owners of the copyright of said musical compositions;

(b) Restraining ASCAP from obtaining the right of public performance of any musical composition synchronized with motion picture films when such musical composition is performed publicly for profit in conjunction with the exhibition of such motion picture films;

(c) Restraining ASCAP's members from refusing to grant to motion picture producers the right to publicly perform for profit through the exhibition of motion picture film, all musical compositions which they allow motion picture producers to synchronize with motion picture film;

(d) Restraining ASCAP's members from licensing, except to motion picture producers, the right of public performance for profit through the exhibition of motion picture films, of musical compositions synchronized with motion picture films;

(e) Restraining ASCAP and its members from conspiring with motion picture producers for the purpose of including a clause in contracts issued by producers to exhibitors directly or indirectly requiring exhibitors to obtain a license from ASCAP as a condition to the exhibition of the licensed pictures."