**RING v. SPINA et al.**

United States District Court
S. D. New York.
May 17, 1949.

Alfred S. Julien, New York City, for plaintiff.

Wittenberg, Carrington & Farnsworth, New York City (Philip Wittenberg, New York City, of counsel), for defendants Spina, Heyman, and Pauker.

Greenbaum, Wolff & Ernst, New York City, (Edward S. Greenbaum, Alexander Lindey, Milton Ross, and Mervin Rosen-

man, New York City, of counsel), for defendant Dramatists Guild of Authors League of America, Inc.

RIFKIND, District Judge.

The plaintiff brought this action against the defendants Spina, Heyman and Hannan and the Dramatists' Guild of the Authors' League of America, Inc. (hereinafter, Guild), for treble damages and equitable relief under the anti-trust laws. 15 U.S.C.A. §§ 15, 26. A temporary injunction was granted by the Court of Appeals at the instance of the plaintiff. Ring v. Spina, 2 Cir., 1945, 148 F.2d 647, 160 A.L.R. 371. Its terms are set out hereafter. Pursuant to the direction of the Court of Appeals, 2 Cir., 166 F.2d 546, the claim for damages was tried to a jury. The jury found a special verdict that the defendants had violated the anti-trust laws but had not thereby damaged the plaintiff. Plaintiff's claims for equitable relief were tried to the court and are now to be determined. In addition, the reasons for my withdrawal of one certain claim for damages from the jury should be stated. But first the facts, as revealed by the evidence, deserve brief recitation.

Defendants Spina, Heyman and Hannan are the authors of "Stovepipe Hat," a musical play. One Gaumont, a producer, contracted with them on February 7, 1944, to produce "Stovepipe Hat." Defendant authors were and are members of the defendant Guild. Gaumont was a signatory of the Minimum Basic Agreement (hereinafter, M.B.A.) promulgated by the Guild. The M.B.A. is a comprehensive private "statute" governing the production of plays in the United States and elsewhere, the disposition of motion picture and other rights to reproduction, and the rights and duties of authors and producers. Among other things, it establishes the author's and producer's right to veto any proposed changes in the play, the minimum royalties to be paid by producers, and compulsory arbitration of any disputes arising between authors and producers. Substantially all authors of repute are members of the Guild, and substantially all producers of note are signatories of the M.B.A. The M.B.A. forbids members and signatories to deal with non-members and non-signatories.

The Spina-Gaumont production contract for "Stovepipe Hat" (Spina acted throughout as agent for the other author-defendants) specifically incorporated the M.B.A. in its entirety, spelled out in detail the royalties to be awarded with respect to stage and film rights here and abroad, and obligated Gaumont to produce the play on or before May 7, 1944, or to pay $1500 to the Guild, for the authors' account, for the privilege of postponing the opening to October 7, 1944. This contract was made on the standard form supplied by the Guild and was countersigned by the Guild, as required by the M.B.A. Simultaneously were executed two letters by which Gaumont contracted to hire Spina as General Supervisor of the artistic and musical phases of the production. By the terms of these letter-agreements, Spina had a veto over the selection of cast, production staff, theaters, changes in the play, lighting and sets.

The plaintiff, Ring, had become a partner of Gaumont and had invested about $50,000 in the proposed production of "Stovepipe Hat" when, on May 4, 1944, Gaumont appeared to be unable to complete the necessary financing. Ring, not yet a signatory to the M.B.A., then attempted to negotiate an arrangement with Spina whereby Spina would cooperate with Ring in terminating Gaumont's participation in the venture and Ring might replace Gaumont as producer on the same terms and conditions as existed under the Spina-Gaumont production and supervision contracts, except that one Samrock was to be the sole arbitrator of differences which might arise between them, instead of the arbitrators provided for under the Spina-Gaumont contracts. Spina's attorney disapproved the proposed arrangement. Thereupon Ring signed the M.B.A., making him eligible to deal with Guild authors, and promptly brought an action against Gaumont in this court which was settled on May 12, 1944 by a stipulation whereunder Gaumont assigned to Ring all his rights of every kind against all persons in connection with the play.

The play was produced by Ring in New Haven on May 18, 1944, and subsequently in Boston. Disputes developed between Ring and Spina concerning changes in the play. Spina refused to consent to changes

desired by Ring, and Ring, who by that time had invested over $100,000, closed the play on May 27, 1944. On June 7, 1944, Spina demanded that arbitration be had pursuant to the M.B.A. On June 14, 1944 Ring instituted this suit against the authors and the Guild, alleging violation of the anti-trust laws and asking treble damages, temporary and permanent injunctions against arbitration under the M.B.A. and against the enforcement of the M.B.A., a declaratory judgment of plaintiff's rights in the play, an injunction prohibiting defendant authors from enforcing their copyrights (in fact only a small portion of the play is copyrighted), and an injunction prohibiting defendant authors from interfering with plaintiff's production of the play. The vacation by the district court of a temporary restraining order was reversed by the court of appeals, which issued a temporary injunction restraining arbitration, restraining defendants from enforcing the M.B.A., and restraining defendant authors from selling or claiming the right to sell the play.

That the M.B.A. constitutes an illegal agreement in restraint of interstate trade and commerce was held by the Court of Appeals in Ring v. Spina, 2 Cir., 1945, 148 F.2d 647, based upon an analysis of alleged facts there set forth. Since those allegations have been amply established, it follows that the M.B.A. is illegal. And so I charged the jury, leaving it to them, however, to decide whether the Guild was a labor organization exempt from the anti-trust laws under 15 U.S.C.A. § 17. They decided that the Guild was not a labor organization and I see no reason for rejecting their finding.

Plaintiff's demands for equitable relief are interpreted by him to mean that defendants be enjoined from attempting to enforce any rights under the M.B.A. or contracts subsidiary thereto, and from interfering in any way with plaintiff's production of "Stovepipe Hat" for a reasonable time after the final disposition of this suit. Plaintiff disavows any desire for a final adjudication of the parties' rights to the play, the scale of royalties, or reproduction rights. He prefers to leave those questions to be determined when and if defendant authors

should seek to enforce any rights they assert. Such a disposition of this case cannot be tolerated. It amounts to an open invitation to litigation and seriously and adversely affects the marketability of the play and any subsidiary rights therein. The rights and duties of the parties should be set forth with sufficient precision to afford them guidance, and the controversy should, if possible, be finally disposed of so as to secure an end to litigation.

Plaintiff is entitled to injunctive relief which would protect him against prospective damage. 15 U.S.C.A. § 26. Such damage arises when there is danger of interference with rights or privileges he now enjoys, not merely as a member of the general public, but as one engaging in the commerce which is being restrained. See Minnesota v. Northern Securities Co., 1904, 194 U.S. 48, 70–71, 24 S.Ct. 598, 48 L.Ed. 870. Cf. Ketchum v. Denver & Rio Grande R. Co., 8 Cir., 1917, 248 F. 106. The United States is the proper party to protect the interests of the general public under the anti-trust laws. Union Pac. R. Co. v. Frank, 8 Cir., 1915, 226 F. 906.

The rights Ring asserts are rights with respect to the play "Stovepipe Hat," for that is his only present or prospective connection with play production. What those rights are it is difficult to determine. Whether by virtue of the stipulation entered into by Ring and Gaumont or by subsequent implicit agreement between Ring and Spina, the relations of Ring and Spina were at least tacitly assumed by both to be governed by the Spina-Gaumont contracts. The Spina-Gaumont production contract embodied the M.B.A. The latter is illegal, and the former, inseparable as it is from the latter, is also illegal. It would seem to follow that there is no production contract between Ring and Spina, and therefore that Ring has no contractual rights in the play. The Spina-Gaumont supervision contracts then become meaningless and fall with the principal contract. It can hardly be said that Ring is entitled to unlimited rights to the play simply because it has become an article of commerce under the provisions of an agreement responsive to the forces generated by an unlawful combination. Cf.

Bruce's Juices v. American Can Co., 1947, 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219. See Alden-Rochelle, Inc., v. American Soc. of C., A. and P., D.C.S.D.N.Y., 1948, 80 F.Supp. 888, 899. Nor is the situation analagous to Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, as it might conceivably be were this a suit by defendant authors to enforce a copyright in the play. The Court of Appeals suggested, however, that it might be possible for the trial court "to separate the rights and duties under the specific production contract assigned to plaintiff from the more far-reaching provisions of the Basic Agreement incorporated therein by a general reference." 148 F.2d 647, 653.

If all references to the M.B.A. are excised, then what remains of the production contract gives the producer the sole and exclusive right to produce the play on the speaking stage of the United States and Canada, fixes the total and advance royalties to be paid the authors, provides for the authors' agents' commissions and their appointment as agents for the disposition of subsidiary rights (but refers to the M.B.A. for the producer's interests in such rights), provides for arbitration of disputes among authors as to the disposition of subsidiary rights, and requires the producer to produce the play on or before May 7, 1944 or, if he pays $1500 for the privilege, to postpone production until October 7, 1944. The production contract does not, except by reference to the M.B.A., provide for the consequences of failure to produce on time; interruption of the run of the play; the producer's interest in foreign production, foreign rights, or subsidiary rights; rights and duties with regard to changes in the play, cast, or production; authorship credit; and other items too numerous to detail. To determine the entire contract between the parties from the production contract alone, is impossible. What is left is a truncated fragment of the understanding of the parties.

█ Moreover, apart from the M.B.A., the production contract is itself an agreement imposed by the force of the illegal conspiracy. Agreements molded by the forces generated by an unlawful combination are invalid whether they are multilateral like the M.B.A. or trilateral, like the production contract. Thus, no matter how viewed, the production contract can hardly survive.

It does not follow that the plaintiff is entitled to no relief. The M.B.A. is an agreement, illegal under the anti-trust laws, which restrains commerce in dramatic productions generally, and which imposed restraints on commerce in connection with the production of "Stovepipe Hat." The defendant authors are members of the Guild, which is a conspiracy in restraint of trade, and they have applied the force of that conspiracy in connection with "Stovepipe Hat." That the plaintiff has not yet suffered measurable damage therefrom does not establish that he is unlikely to do so in the future. There is nothing to indicate that in the absence of an injunction the defendants will not continue to enforce the M.B.A. and to employ the power of the conspiracy with respect to "Stovepipe Hat."

█ I can not write a contract for the parties, but the plaintiff's statutory right to freedom from unlawful interference with his commerce can be protected by declaring the M.B.A. to be illegal, the production contract between plaintiff and individual defendants subsidiary thereto to be illegal, and the enforcement of either to be illegal and prohibited. Arbitration should be enjoined. Although this leaves plaintiff without contractual rights to "Stovepipe Hat," his right to freedom from illegal restraint can be protected by enjoining the defendant authors on the one hand, and the defendant Guild on the other, from conspiring to interfere or jointly interfering with plaintiff's acquisition of any and all rights in plays, including "Stovepipe Hat." The defendant authors are not thereby to be compelled to sell or license "Stovepipe Hat" to the plaintiff, or enjoined from agreeing among themselves on the terms under which they may choose to sell or license the play; but they may not offer the plaintiff terms less favorable than those offered any other producer; nor require him to subscribe to the M.B.A.; nor associate the Guild in any illegal way with the transaction; nor conspire or agree with the Guild or with any

other members of the Guild to exact particular terms or conditions from him.

■ The claim for damages which I withdrew from the jury concerned a $1500 check which Gaumont delivered to the Guild for the account of the authors in order to procure a postponement of the production date to October 7, 1944 under the Spina-Gaumont production contract. When Gaumont assigned his rights thereunder to the plaintiff in consideration of $6659 it was stipulated that "[I]t is understood that the balance of $1500 will be paid by the defendant [Gaumont] obtaining the return of said check or stopping payment thereof, all of which has been agreed to by the author." Spina had notice of this stipulation and consented thereto. Spina executed a letter dated May 16, 1944, which was delivered to the Guild, requesting the Guild to return the $1500 to Gaumont. By letter of May 12, 1944, to Gaumont's attorney, Ring agreed to pay the $1500 to Gaumont if the Guild did not repay it. On May 29, 1944, the Guild wrote to Spina, enclosing for his and Ring's signatures a form of proposed agreement whereby "The Dramatist's Guild is hereby instructed to refund said $1500 to Irving Gaumont." The record is bare of any evidence of further action in this connection. Neither Gaumont nor Ring made demand upon the Guild for this money.

Ring claims that the Guild refused to return the $1500 to Gaumont because its M.B.A. provided that "No part of such advance shall in any event be returnable by the Author to the Manager"; that the M.B.A. is an agreement illegal under the anti-trust laws; that the Guild refused to pay by reason of that illegal agreement; and that, therefore, plaintiff was damaged to the extent of the $1500 by the defendant Guild's violation of the anti-trust laws, for which he is entitled to treble damages, amounting to $4500.

Patently the Guild was under no duty to give Ring the money before it had notice of the stipulation between Ring and Gaumont concerning the money. Even after it had notice that Ring had supplanted Gaumont as producer, it would not have been justified, much less under any duty, to pay Ring, since both the stipulation and Spina's letter envisaged payment (or cancellation of the check) to Gaumont, not to Ring. Whatever the Guild's duty to pay Gaumont upon demand, or to surrender the check, the evidence is uncontroverted that it was quite prepared to do so upon receipt of formal authorization from all interested parties, including Ring and Spina. That it never got. To find that Ring was damaged by virtue of the above-quoted provision of the M.B.A. would be incorrect as a matter of law, for there is no evidence that the Guild refused to pay over the $1500 to either Gaumont or Ring. Not having refused, there can arise no question of fact whether its (non-existent) refusal was motivated by anything in the M.B.A. or any other illegal agreement.

I did not leave to the jury the question whether plaintiff may be entitled to a judgment for $1500 on an ordinary claim for money had and received and do not now decide, because, at the beginning of this trial, it was expressly stipulated that every aspect of this case was withdrawn except the claim for treble damages for violation of the anti-trust laws, and for equitable relief against continued violation. Under the circumstances a claim for money had and received was expressly excluded.

■ Neither damages nor attorney's fees are recoverable as an incident to equitable relief under the anti-trust laws, Decorative Stone Co. v. Building Trades Council, 2 Cir., 1928, 23 F.2d 426; Alden-Rochelle, Inc., v. American Soc. of C., A. and P., D.C. S.D.N.Y., 1948, 80 F.Supp. 888, but costs may, and in this case should, be awarded plaintiff where his action is both at law for treble damages and in equity for an injunction, and he obtains equitable, though not legal relief. Midwest Theatres Co. v. Co-operative Theaters, D.C.E.D.Mich.1941, 43 F.Supp. 216.

Submit findings, conclusions and decree in accordance with this opinion.