### CONTINENTAL SECURITIES CO. v. MICHIGAN CENT. R. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. November 3, 1926. as Amended on Application for Rehearing, December 16, 1926.)

No. 4605.

1. **Monopolies ⬤⟹24(1)—Private suit is not maintainable to enjoin violation of Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830).**

Minority stockholder cannot in private suit invoke aid of equity against his corporation to enjoin violation of Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830).

2. **Commerce ⬤⟹81—Dissolution for intrastate traffic of combination of railroads for general traffic cannot be decreed as violative of state law, without affecting interstate traffic and trespassing on federal subject.**

It is impossible to decree dissolution for intrastate traffic, as violative of state law, of combination for general traffic of competing railroads, without directly affecting and upsetting interstate traffic, and thus trespassing on federal subject, as to which Congress has legislated.

3. **Monopolies ⬤⟹24(1)—Any right of private suitor to injunction suit against control of railroad by competing line does not extend to one buying into controlled line (Clayton Act, §§ 7, 16 [Comp. St. §§ 8835g, 8835o]; Sherman Act [Comp. St. §§ 8820–8823, 8827–8830]).**

Any right given a private suitor by Clayton Act, § 16 (Comp. St. § 8835o) in view of section 7 (section 8835g) to complain in equity of control of a railroad by a competing line, absolutely forbidden by the Sherman Act (Comp. St. §§ 8820–8823, 8827–8830) is not available to one who voluntarily and intelligently bought into the controlled line when the control was substantially the same.

4. **Monopolies ⬤⟹24(1)—Injunctive relief, given by Clayton Act against threatened damage for violation of anti-trust laws, does not extend to a suit to dissolve prior completed combination (Clayton Act, § 16 [Comp. St. § 8835o]).**

Clayton Act, § 16 (Comp. St. § 8835o) giving right to injunctive relief to any person against threatened loss or damage from violation of anti-trust laws, does not authorize suit in substance for dissolution of combination, which took permanent shape as a completed act some time before bill was filed, with injunction merely collateral and incidental.

5. **Action ⬤⟹65.**

Relative to issuing injunction, courts take into account situation at time of hearing.

6. **Railroads ⬤⟹16—Under conceded facts, in action by minority stockholder in railroad against majority stockholder, held, plaintiff was under burden of proceeding to overcome inference of fairness.**

Under conceded facts, in action by minority stockholder in railroad company against majority stockholder, another railroad company, held that, even if burden of proof be on defendant, plaintiff was under burden of proceeding with proofs to overcome inference of fairness of defendant's acts.

7. **Railroads ⬤⟹16—Unfair treatment of railroad by majority stockholder, another railroad company, held not shown in minority stockholder's action.**

Unfair treatment of railroad in the conduct of its affairs by majority stockholder held not shown in minority stockholder's action, either by agreement against increase of stock before payment of secured debt, or by having it join in guaranty of third company's bonds, or, in division of business.

Appeal from the District Court of the United States for the Southern Division of the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit by the Continental Securities Company against the Michigan Central Railroad Company and the New York Central Railroad Company. Bill dismissed, and plaintiff appeals. Affirmed.

Orla B. Taylor, of Detroit, Mich., and Frederick A. Henry, of Cleveland, Ohio

(Snyder, Henry, Thomsen, Ford & Seagrave, of Cleveland, Ohio, on the brief), for appellant.

A. C. Angell, of Detroit, Mich., and Alex S. Lyman, of New York City (Frank E. Robson, of Detroit, Mich., on the brief), for appellees.

Before DENISON, DONAHUE, and MOORMAN, Circuit Judges.

DENISON, Circuit Judge. In 1898, the Vanderbilt families owned controlling interests in the stock of the Lake Shore & Michigan Southern Railroad and of the Michigan Central Railroad. They also owned the controlling interest in the New York Central & Hudson River Railroad. At that date they caused the New York Central & Hudson River to purchase this control of stock of each of the other railroads. This relationship continued until 1914, at which date the New York Central & Hudson River and the Lake Shore & Michigan Southern consolidated as the New York Central Railroad, and that line, the New York Central, has continued to own 90 per cent. of the Michigan Central stock.

In 1903, the appellant, the Securities Company, bought 100 shares of the Michigan Central stock, out of a total of about 18,750 shares. In February of 1915, the Securities Company, by Clarence H. Venner, its president, filed this bill in the court below, alleging first, that the common management of the Lake Shore lines and the Michigan Central lines constituted a restraint of competition in interstate commerce by its union of parallel and competing lines, and was in violation of the Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830) and the Clayton Act (38 Stat. 730), and also in violation of the Constitution and laws of Michigan and other states, and alleging, second, that the New York Central, as the majority stockholder of the Michigan Central, was fraudulently conducting its affairs to the injury of the minority stockholders and for the sake of benefiting the former Lake Shore. The District Court dismissed the bill, finding that there was no detrimental domination.

[1, 2] It is now settled that a private suitor cannot invoke the aid of a court of equity to enjoin a violation of the Sherman Anti-Trust Act (Paine Lumber Co. v. Neal, 244 U. S. 459, 37 S. Ct. 718, 61 L. Ed. 1256), and it would be impossible to decree a dissolution of such combination in intrastate traffic without directly affecting and upsetting interstate traffic and thus trespassing upon a federal subject as to which Congress has legislated.

[3, 4] The plaintiff gets no help from the Clayton Act. Section 7 of that act (Comp. St. § 8835g) gives to the Interstate Commerce Commission no power to prevent one railroad from controlling a competing road, unless there is in the transaction an actual intent to stifle competition, while the Sherman Act, as construed, reaches every combination which gives the power to suppress competition, and hence it is claimed that the exception made by the latter part of section 16 (Comp. St. § 8835o) does not interfere with whatever right the first part of that section may give to a private suitor to complain in equity of a control absolutely forbidden by the Sherman Act. Assuming, without deciding, that this claim may be correct, we observe that other reasons sufficiently persuade us to our stated conclusion.

The first is that substantially the same combination of which plaintiff complains had been long in existence, as an established status, when plaintiff bought its stock in 1903. Since 1898 the New York Central & Hudson River Railroad had owned the controlling stock in the Lake Shore and in the Michigan Central. It was a holding company, like the Northern Securities Company in 193 U. S. 197, 24 S. Ct. 436, 48 L. Ed. 679. By the merger with the Lake Shore in 1914 the minority stock in the Michigan Central did not become substantially more subject to the control of the competing railroad than it had been before. There might be formal reasons why the new control would be unlawful when the old was not; but they do not satisfy us as the sole support of a suit in equity not otherwise maintainable. It is obvious that plaintiff cannot be heard to complain of the burden which it voluntarily and intelligently assumed when it bought into the controlled corporation.

The other reason is that the favor of section 16 extends only to injunctive relief to be given to "any person * * * against threatened loss or damage." This is not appropriate language to reach such a suit as this, in which a stockholder files a representative suit, and apprehends no "threatened loss or damage" save that which comes through the damage to his corporation. The substantial complaint of the bill, so far as based on the Anti-Trust Act, is against the situation which took permanent shape as a completed act some time before the bill was filed. The main remedy sought is dissolution of the combination. Section 16 never has been held to reach such a case. The result sought is practically the same as would be asked for in a suit by the Attorney General

It is true that the bill claims that there should be an injunction against the continuance of the combination; but that is largely collateral and incidental to the desired dissolution by compelling a sale of the stock. The force of the permission granted by section 16 may well be exhausted by extending it to a private suit for injunction against two strangers, who by their intermonopoly and trade restraint will injure his independent business.

We do not interpret the action of the Supreme Court in the General Investment Case, 260 U. S. 261, 286, 43 S. Ct. 106, 67 L. Ed. 244, in dismissing the case without prejudice to a new suit under the anti-trust laws, as implying that such a suit would lie. The case had been commenced in the state court, and it was held that there had been no jurisdiction. Whether there would be jurisdiction, or a good case, if the suit were begun in the federal court, was a question not presented by the record, and the action of the Supreme Court was merely a refusal to decide that question, or to let it seem to be decided, in a case where it did not exist. A dismissal for lack of jurisdiction is always to be without prejudice.

The Paine Case, supra, was not a stockholders' suit; but the reasons for permitting a private party to sue for injunction under the Sherman Act appeal to us as less persuasive when he is acting, as here, for his participating corporation, than when he is, as there, an injured stranger. General Investment Case, 260 U. S. at page 286, 43 S. Ct. 106, 67 L. Ed. 244.

It is not easy to see much practical distinction between the cause of action of that minority stockholder in a railroad, who says that his stockholding interest will be irreparably injured because the majority stockholder in managerial control has united this railroad with another one owned by the majority stockholder with the purpose of eliminating any competition and in violation of the anti-trust laws, so that profitable business which would normally go to the first road is diverted to the second, and the cause of action of that same minority stockholder in the same railroad who complains of the same injury to his private interests and from the same acts, but because the majority stockholder is trustee for the minority. Yet there is a theoretical distinction, and for the purposes of this opinion we assume it to be sufficient. This brings us to the consideration of the only remaining complaint, the alleged unfair and constructively fraudulent majority management of the Michigan Central for the purpose of injuring it and helping the Lake Shore.

[5, 6] The Securities Company complains that the District Judge put upon it the burden of showing that the management had been in fact unfair and injurious to the Michigan Central. It says that the New York Central, as a majority stockholder, held its managing powers as trustee for all stockholders, including appellant, and that by the familiar rule when the trustee as managing stockholder dealt with itself as owner of the Lake Shore lines, the burden was upon it to show that its acts of this class were fair and just. When a majority stockholder causes his corporation to make a contract with himself, or with another corporation controlled by him, by which his first corporation parts with large values or assumes great burdens, the rule invoked by the appellant is of common application. When, however, as here, the relations involved pertain, not to specific contracts, but to the regular course of a give and take business, continued over many years without challenge or objection, the burden of proof is not of such clear application. However that may be, the question, when seen against the background of undisputed facts here existing, becomes academic. The New York Central owned, not a mere majority, but 90 per cent., and of late years even more, of the Michigan Central stock. Appellant bought its stock five years after the New York Central domination was thus established. While the same general course of business as now complained of was being carried on, appellant for 12 years made no complaint. This Vanderbilt and New York Central management has built the Michigan Central up from a comparatively weak to a relatively strong position. It has been made practically part of a through line to New York and Boston, instead of stopping at Detroit or (later) Buffalo. Its handicap for lack of Buffalo terminals has been supplied by giving it joint use of the New York Central terminals. Its handicap at Detroit has been finally overcome by the enormously expensive tunnel and Detroit terminals. Its financial strength, partly by reason of this association, has enabled it to borrow fixed capital for improvements to the amount of four or five times its whole capital stock. In its equipment purchases it has had the aid of the guaranty of its bonds by the New York Central. These aids would not have been given by a secretly hostile management. To get the complete background, we are not confined to the record on appeal, which closed with the figures of 1920. In issuing injunctions, or declining so to do, courts take into account the situation at the time of the hearing. Appellant's own showing, filed in this court in a col-

lateral matter, is that the total book value of the capital and surplus had increased to $82,000,000 in 1926, and that this stock for which, according to the market value, it paid about $125 per share in 1903, is now salable at about $1,000 per share.

These conceded facts do not strongly indicate an intent by the majority to "freeze out" the minority, and, if the burden of proof to show fairness still remains upon defendants, at least the burden of proceeding is shifted and the trier of fact must be shown proofs strong enough to overcome the otherwise inevitable inference from this whole situation. This inference is confirmed by observing that though this bill was filed 11 years ago in behalf of all minority stockholders, no one has indicated any desire to join in the complaint, unless it be Mr. Venner, appellant's president; and their combined stockholdings hardly make one-tenth of 1 per cent. All others seem content.

[7] Three grounds are specifically urged to support the claim of unfair domination. The first concerns the so-called collateral trust. When the New York Central, in 1898, bought 90 per cent. of the Michigan Central stock, it borrowed the money therefor upon collateral trust bonds, and as security for these bonds it pledged with a trustee the entire stock so purchased. The trust pledge provided various conditions for the safety of the security. Since part of the value of the stock lay in its power of control, and since this would be endangered by increases of capital stock, it was agreed that the capital stock of the Michigan Central should not be increased until this stock purchase-money debt was paid. This provision is now said to have stifled the Michigan Central and made it helpless to obtain new capital and to expand. The provision was a common one in such instruments; it was a reasonable, if not a necessary element of security; if it were a serious injury to the Michigan Central it would hurt the majority stockholders nine times as much as it would hurt the minority; and it does not appear that during the 25 years of its existence it has done any harm. It perhaps would, or perhaps would not, prevent the increase of capital stock by stock dividends; but no injury necessarily follows from such prevention, and the majority and minority would suffer in like measure. In this element of complaint, we find nothing tending to show abuse of power by the majority.

The second ground of complaint urged relates to guaranteeing the bonds or joining in the obligations of affiliated companies. The Toronto, Hamilton & Buffalo was practically a feeder railroad. Its stock was partly owned by the Michigan Central and the New York Central. An issue of its bonds was guaranteed by both these roads. It is said that this guaranty was ultra vires, as to the Michigan Central. The same complaint is made as to the joinder by the Michigan Central in equipment purchase contracts with the New York Central and the Big Four. As bearing upon the issue now involved, it is immaterial whether these contracts were ultra vires. They brought to the railroad large benefits and imposed upon it contingent dangers; the incidence of both was believed to be for the interest of the railroad; the benefits have been realized, the contingent dangers have not developed and probably never will. There is not the slightest reason to think that these contracts were not determined upon by the majority controlling interest in good faith and in a reasonable belief that they would be a net benefit to all the stockholders. These matters do not support the bill.

The third complaint is that, since the New York Central was the owner during the first period of the capital stock of the Lake Shore, and during the second period of the Lake Shore itself, while it owned only 90 per cent. of the Michigan Central, it unfairly diverted to the Lake Shore business which should have come to the Michigan Central, and so built up the former at the expense of the latter. The greater part of the proofs is devoted to this complaint. We think it fails. The New York Central management owed the same duty to the Lake Shore line which it owed to the Michigan Central line, to fairly apportion such business as it could control for division. Errors in judgment in deciding what division was fair under the infinity of varying circumstances, or even sporadic intentional discrimination by overzealous subordinates, do not make out the necessary case. It is not established, unless there was an intentionally unfair general diversion. There is an initial improbability that the depression of and injury to the value of only 10 per cent. of the stock would be the controlling motive or an impelling motive in deciding upon the policy of unfair oppression; even for one disposed to be unfair the prize would not be big enough; and this initial improbability is not removed.

In such a matter as this there can be no absolute yardstick by which to measure fairness. Conditions change from week to week. The problem is presented, concretely, among other instances, by freight which came from the Far West destined for New York, and which reached Chicago in care of the "New York Central Lines." It was the duty of the

Chicago common agent of the Michigan Central and the Lake Shore to divide this freight fairly between the two. That did not necessarily mean equally. The best service to the shippers was important. One road might be less congested than the other or might better offer groups of commodities for the final destination or might be higher in favor of particular shippers or consignees. The testimony, from responsible agents who had charge of this, is that their primary purpose was to divide this freight equally and they modified this only as particular circumstances indicated to be fair in particular instances. This general testimony is not successfully disputed. There are a few specific instances in the record which have the color of unfair favor to the Lake Shore. There are other instances which show favor to the Michigan Central. It seems clear that the only way to get a satisfactory basis for any positive conclusion, would have been to make a thorough analysis of a large amount of business for a long period of time, from many common points, and with due regard to all the circumstances affecting the indicated developments. The plaintiff asked the court for an order that the Michigan Central produce a compilation of that character. It would obviously be very expensive. The court made the order on condition that the plaintiff give a bond of $100,000 to indemnify defendants against the expense, if defendants ultimately prevailed. The plaintiff did not accept the conditions. Later the defendants offered to submit all books and records to accountants or experts whom the plaintiff, at its own expense, might employ. The plaintiff declined to acquire the desired information in that way. The result is that the record, in the main, shows only what are in many instances obviously half truths, along with specific items and fragmentary data wholly insufficient to support the conclusion of unfair diversion of business. For this incompleteness we hold the plaintiff responsible, for there is no duty resting upon a corporation to incur, without indemnity, burdensome expense in making any compilation of data pertinent to otherwise unsupported charges made by a minority stockholder.

Without doubt, during the period of joint control, the tonnage shipped over the Lake Shore has increased in sum total vastly more than the Michigan Central tonnage, but this fact does not prove an unfair control. The Lake Shore line had the prestige of a better reputation for through traffic in days when the Detroit river and other conditions handicapped the Michigan Central. It ran through a territory vastly more productive of initial hauls and it received from the Southwest at various points a great tonnage of through traffic which was normally less likely, or wholly unlikely, to reach the Michigan Central. With this lack of general comparability, the relative percentages of the increase are a better criterion of fair treatment than is the absolute increase. A graphic chart in evidence shows that during the period from 1898 to 1914, and using as a par basis the amount of gross earnings from the operation of each company in 1898, the Michigan Central increased 140 per cent. and the Lake Shore 150 per cent. The graphic lines rise and fall with good and bad traffic years, but in general parallelism, varying from superposition to a difference of 30 per cent. Starting again in 1915, with the gross earnings of each road for that year serving as its own par basis, these lines show that during the 1915–1920 period, the Michigan Central increase was 140 per cent. and the New York Central 130 per cent. Of course, there are so many possible variants that this comparison is not conclusive; but the same thing is true of every conclusion on this issue which appellant seeks to have us draw.

Two instances which appellant relies upon as showing undue favoritism may have brief attention. One is that at one time shipments of citrous fruit from Southern California were routed over the Lake Shore, when it is said they should have been divided. There is nothing to show that this was long continued, or that it was not fairly counterbalanced by other commodities sent over the Michigan Central; but, aside from these considerations, it is impossible safely to say, many years afterwards and from this fact alone, that there was favoritism. The most rapid possible shipment was necessary. The customs barriers alone, entering and leaving Canada, made an objection in the minds of some shippers, if not in fact; and much of this traffic coming up from the Southwest would find its shortest route over the Lake Shore. In other words, such an instance as is here shown relating to citrous fruit may mean something or may mean nothing, upon the issue of undue favor.

The other one of these two items is with regard to the Chicago and New York passenger service. As to most of the passenger trains over the two roads, there is little to choose; but the best train on the Lake Shore is scheduled two or three hours shorter than the best train on the Michigan Central. The single special fast train must go over one road or the other; the record indicates that there is

not enough prospective business at the extra fare to justify two trains. Entering and leaving Canada and crossing the Detroit and the Niagara rivers are matters to be considered; the suitability of the respective roadbeds for such traffic and the prejudices of the traveling public are also important. Upon the whole there is nothing to indicate that it was beyond the bounds of fair discretion to give this fastest train to the Lake Shore.

It is impossible to review all the matters argued; we think we have overlooked nothing; and upon the whole record it sufficiently appears that in exercising control over the Michigan Central, the majority stockholder has not been moved by any intention to depress the value of the minority stock or unfairly to benefit the Lake Shore lines at the expense of the Michigan Central.

Upon the representation that the Michigan Central was about to be leased to the New York Central for 99 years, and that thereby there was danger that the subject-matter of this suit might, in a sense, disappear from existence, we enjoined the New York Central from voting its stock at the Michigan Central meeting in favor of such lease until there should be opportunity to hear and decide this appeal. Since the principal issue in this present case is now decided in favor of the defendant, there is no further occasion for collaterally protecting the subject-matter, and that injunction will not be continued.

Decree affirmed.