Samuel GOMBERG, Samuel Dreier, Abraham Perlen, Ale Perlen, and Sol Poler

v.

The MIDVALE COMPANY, a corporation, Baldwin Securities Corporation, a corporation, Henry B. Bryans, Joseph N. Ewing, Edward Hopkinson, Jr., Page Hufty, Richard T. Nalle, and Robert C. Shields.

Florence W. BRILL, Herman Canter, Edward Netter, Frances Netter and Robert Netter

v.

The MIDVALE COMPANY, Baldwin Securities Corporation, Midvale-Heppenstall Company, The Heppenstall Company, Howard H. Casey, Walter H. Lewis, Lloyd R. Loewen, Lewis W. Metzger, Richard T. Nalle, Adolph O. Schaefer, Edward Hopkinson, Jr. and C. E. Acker.

Civ. A. Nos. 20012, 20019.

United States District Court
E. D. Pennsylvania.

Dec. 30, 1955.

John E. Walsh, Jr., and Richard C. Bull (of White, Williams & Scott), Philadelphia, Pa., and Ira R. Bennett, New York City, and Rubin Baron, Brooklyn, N. Y., for plaintiffs Gomberg et al.

Richard H. Egnal and George Netter (of Geist & Netter), New York City, for Brill et al.

Thomas B. K. Ringe (of Morgan, Lewis & Bockius), Philadelphia, Pa., for defendants, except Heppenstall Co.

Chas. E. Kenworthy, Pittsburgh, Pa., for Heppenstall Co. and Midvale-Heppenstall Co.

GANEY, District Judge.

The issues now before us arise out of two separate civil actions which, although based upon different grounds, have as their common purpose the single objective of obtaining an injunction preventing the consummation of a "Purchase Agreement" entered into between The Midvale Company and the Midvale-Heppenstall Company on December 2, 1955.

Under the agreement Midvale agreed to sell, subject to the approval of a majority vote of the Midvale stockholders, all of its physical and operating assets to Midvale-Heppenstall for approximately $6,100,000 in cash. Settlement is to be made on or before December 30, 1955, the last business day of the year, so that Midvale may take advantage of an operating loss carry-back for federal income tax purposes for the years 1953 and 1954. If the agreement is consummated on or before that date, Midvale claims that it will sustain an operating loss of approximately $6,800,000, which, when allowed by the Commissioner of Internal Revenue, will eliminate any liability of the corporation for federal income taxes for the year (estimated at $325,000) and give rise to a carry-back claim for refund of federal income taxes for the years 1953 and 1954, amounting to almost $1,800,000. This will leave an operating loss carry-over of approximately $2,700,000, available to offset taxable income of Midvale realized in the years 1956 to 1960, inclusive, unless sooner exhausted. The carry-back will not produce as large a saving if it is taken from a year following 1955. For in the year 1953, the profit of Midvale before taxes based on income was $3,-127,781 as compared with $824,901 for 1954 and $608,400 [1] in 1955. It is for this reason that Midvale is desirous of consummating the sale in this calendar year.

One of the actions, Samuel Gomberg et al. v. The Midvale Company et al., was brought by four of the dissenting minority stockholders of The Midvale Company on behalf of themselves and on behalf of all other stockholders similarly situated against The Midvale Company ("Midvale"), a Delaware corporation; Baldwin Securities Corporation ("Baldwin"), a Pennsylvania corporation; and the twelve directors of Midvale. The court's jurisdiction over the subject matter of this action depends on diversity of citizenship of the parties. The basis of the action is that "the proposed purchase price is so grossly inadequate as to shock the conscience of the Court and consti-

1. Approximated.

tute a constructive fraud on the minority shareholders."

There are presently authorized and outstanding 600,000 shares of capital stock of Midvale. The four plaintiffs collectively own but 10,000 shares or 1.66 percent of them. Baldwin owns 371,750 shares or 61.9 percent of the total; by virtue of this ownership, it is able to control, through the election of directors, the operation of Midvale. Baldwin is an investment corporation managed by a board of eleven directors, nine of whom are also directors of Midvale. Although their stockholdings in Baldwin are considerably less than an actual majority, the directors own sufficient stock in that corporation to give them practical working control over it. Under date of December 7, 1955, Midvale notified its stockholders that a special meeting would be held on December 21, 1955, for the purpose of considering and taking action upon the approval or disapproval of the proposed sale. At the meeting of the shareholders, 431,896 votes were cast in approval of the sale. Of these, 371,750 were voted by Baldwin and 1,400 of those were of the directors, leaving 58,746 cast by the assenting minority. The dissenting votes numbered 58,373.

Midvale owns a fully equipped steel plant occupying approximately seventy-three acres of land at Wissahickon and Roberts Avenues, Philadelphia, Pennsylvania. Over twenty-two percent of the building area is occupied by installations of the several Armed Forces of the United States Government containing facilities which must be so maintained until 1966 in connection with other non-government facilities so as to permit them to be placed in complete operation for full production within 120 days. Among its facilities are four open hearth furnaces, machine shops, tempering plants, hammering shop, tire mill, power house, research laboratories and storehouses. It has railroad sidings connecting with two of the large railroad companies. It is one of the principal producers of armor plate, and heavy steel forgings of all kinds weighing from 10,000 to 400,000 pounds. Most of its products are manufactured in accordance with the specifications of individual customers, and require a very high degree of technical skill to meet those specifications. A substantial portion of its production is designed principally for use in heavy ordnance material for the Armed Forces, such as armor-plate, gun tubes and shells.

During the period from January 1, 1947 to November 11, 1955, Midvale has spent $6,987,000 on capital improvements. Of that amount, $3,561,000 was spent subsequent to January 1, 1951. These improvements were necessary to keep the plant going and did not add substantially to its value. In addition, it has during such period spent substantial amounts for repairs and maintenance.

Midvale has been in existence since 1923. With the exception of four years it has shown an annual profit. The loss years were 1932, 1947, 1948, and 1949. Although its annual sales since 1950 have been between twenty-two and thirty million dollars, its net profit has not been high. In 1953, it was $1,357,781, in 1954 it amounted to $724,901 and for the first ten months of 1955 the total was $236,869. Its dividend rates for those same years were $1.35, $1.00 and $.75.

According to the balance sheet which constituted a part of the proxy statement sent to all the stockholders, Midvale had, as of October 31, 1955, current assets of $13,464,773 and current liabilities of $3,054,131. The inventory of raw material, supplies, work in process and semi-finished products had a book value of $4,273,335; the land was valued at $456,834, and the plant and equipment had a net book value after reserve for depreciation, of $7,718,273. Over three-fourths of the inventory consisted of work in process, most of which was allocable to existing firm contracts, and that in pricing work in process no profit element was included. For local tax purposes, the land and plant are assessed at a valuation of $2,561,000.

Apart from the assets to be included in the proposed sale, Midvale has approximately $6,500,000 of net liquid assets consisting of cash, accounts receivable and short term Government securities. When this amount is added to the proposed purchase price and the claimed tax refund which will result from the sale, Midvale will have, after the sale is consummated, in excess of $14,000,000 in cash as its sole asset. It is not contemplated by the board of directors that this fund will be distributed among the stockholders. On the contrary, Midvale's name will be changed to General Industrial Enterprises, Inc., and its corporate existence will be continued with a different business purpose. As stated in the proxy statement: "It is the present intention to employ substantial but varying proportions of its assets * * * for investment and reinvestment in situations which, in the judgment of its Board of Directors, present promising opportunities for ultimate financial profit to the shareholders of Midvale, and, to the extent deemed desirable by its Board of Directors, to participate in the management and control of any or all enterprises in which it has a financial interest."

Midvale cannot assign unfinished work under defense contracts or the obligation to maintain certain facilities in proper working order without the consent of the particular Governmental agency involved. In this action, the approval of Midvale-Heppenstall as an assignee of Midvale has been obtained. The obtaining of this approval is one of the major factors which must be considered in seeking a purchaser. Even though one may offer a substantially higher price for Midvale's assets, if he is not approved by the appropriate agency, his offer cannot be accepted by Midvale.

While its facilities have a capacity to do an annual volume of business amounting to 48 million dollars, all Government work at Midvale of any consequence will cease on March 31, 1956, and there is no present likelihood that it will resume. Yet Midvale or its successor must maintain the Government facilities until 1966. In the opinion of the president of Midvale the change in the character of armor-plate used by the Armed Forces means that there will be less need for Midvale's heavy facilities in the future. In addition, the change from steam locomotives to Diesel engines by the railroads has largely taken away the locomotive steel tire business from Midvale. It has made efforts to counteract these adverse conditions but without success. Tentative propositions were discussed with a number of responsible persons over a period of two years. But because of the special nature of the Midvale business and the necessity both of maintaining the Government and Midvale facilities, and of having the Government approve any purchaser, the task of finding one was most difficult. Finally The Heppenstall Company made an offer which was fairly acceptable to Midvale. Negotiations began on August 31, 1955 and culminated in the Purchase Agreement of December 2, 1955. The directors of Midvale were of the opinion that the price offered was fair and that no better one could be obtained from an acceptable source. Neither Baldwin nor the directors [2] of Midvale have any interest in The Heppenstall Company, Midvale-Heppenstall or the corporations which have agreed to purchase preferred shares in Midvale-Heppenstall.

■■ We now come to the question of the reasonableness of the purchase price. Although section 11.06 of the Purchase Agreement provides that the parties thereto agree that the agreement shall be construed and enforced in accordance with the laws of Pennsylvania, plaintiffs should not be bound by that choice. In the actions before us a statute of Delaware, the state in which

2. Mr. Edward Hopkinson, Jr., a director and chairman of the executive committee of Midvale owns 100 shares of Westinghouse stock. We do not consider this ownership as being equivalent to "an interest." See Allied Chemical & Dye Corp. v. Steel & Tube Co., 1923, 14 Del.Ch. 1, 120 A. 486.

Midvale was incorporated, grants the right to the board of directors, upon the approval of a majority of stockholders, to sell the entire assets of the corporations. 8 Del.C. § 271. We think the Courts of Pennsylvania would refer to Delaware law to determine whether or not the purchase price is adequate. See Restatement, Conflict of Laws, § 197; § 199, Comment a. We must refer to that law also. Kroese v. General Steel Castings Corp., 3 Cir., 1949, 179 F.2d 760, 15 A.L. R.2d 1117. In the absence of statutory provisions to that effect, equity imposes a standard which the terms, conditions and expedience of a sale must meet. Majority stockholders and directors cannot appropriate to themselves the assets of a corporation, and this may not be done indirectly by their personally sharing in the profits of the sale of the corporate assets. Moreover they owe a duty to the minority stockholders to see that the assets are sold for a fair and adequate price. Allied Chemical & Dye Corp. v. Steel & Tube Co., 1923, 14 Del.Ch. 1, 120 A. 486; Allaun v. Consolidated Oil Co., 1929, 16 Del.Ch. 318, 147 A. 257; Baron v. Pressed Metals of America, Del.Ch.1955, 117 A.2d 357.

█ █ In the actions before us there has been no showing that the majority or the directors are gaining a personal advantage from the sale. The burden is, therefore, on the plaintiffs to show that the disparity between the value of the property to be sold and the money to be received is so unreasonable as to indicate that the sellers are recklessly indifferent to the interest of the whole body of stockholders. Baron v. Pressed Metals of America, supra, 117 A.2d 357, 361. Our initial inquiry is what is the value of the assets to be sold. The assets are the physical and operating assets of Midvale. They are not to be sold item by item, but as a going concern. In such a situation the book value, cost, replacement cost, insurance valuations, assessed valuation and appraisals of specific items are entitled to little consideration. The guiding standard is the value of the assets in connection with a sale, or the market value. Allaun v. Consolidated Oil Co., supra, 147 A. 257; Baron v. Pressed Metals of America, supra, 117 A.2d 357, 361–362.

Pursuant to section 2.20(1)(ii) of the Purchase Agreement, Midvale-Heppenstall is guaranteed at least $4,000,000 worth of inventory priced at cost or market whichever is lower. Since Midvale is currently operating at a profit, it may fairly be assumed that the work in process was allocable to profitable contracts. Plaintiffs claim that Midvale-Heppenstall will in fact realize in excess of $4,000,000 on the inventory. They therefore subtract that amount from the purchase price of $6,100,000, and allocate the balance of $2,100,000 to Midvale's land, plant and equipment. The book value for these items is $8,276,432; the land being valued at $456,834, while the plant and equipment is $7,819,598. Subtracting $2,100,000 from $8,276,432, plaintiffs claim that there is a disparity of at least $6,176,432 between the value of the land, plant and equipment and the amount which Midvale-Heppenstall will pay for them.

The value given to inventory is merely one of the factors taken into consideration by a buyer agreeing to pay a certain price for the assets. If this inventory were to be sold alone, no informed buyer would be willing to acquire it for $4,-000,000. It is only in connection with the plant as a going concern that the inventory is worth the amount which the purchaser here is willing to pay for it. Therefore it is not strictly correct to allocate a specific portion of the purchase price to an item in a package deal, because ordinarily it is not known what value a buyer attributes to a particular item. However, on this point the parties to the Purchase Agreement have agreed among themselves to allocate $3,500,000, which is not an unreasonable amount, of the purchase price to inventories. This leaves approximately $2,600,000 allocable to the land, plant and equipment.

We are reminded that the land and plant are assessed for local tax purposes

at a valuation of $2,561,000, and that a real estate expert estimated the land to be worth $2,590,000. We do not doubt that the land, if free and clear of the encumbrances upon it, could be sold for an amount in excess of $2,300,000. But it certainly is not worth that much when it is encumbered with the heavy equipment, which is difficult to move, and a Government contract running to 1966. It is for this reason that the land cannot be valued for sales purposes at either its assessed value or the figure given by plaintiffs' expert.

Returning to the amount of $2,600,000, if we were to subtract this amount from the book value for the land, plant and equipment, the difference is $5,676,432. At first blush this disparity may seem great. One must consider the fact, however, that this is a plant with heavy specialized equipment and that it produces material which has a limited market. It requires highly skilled employees; it is expensive to operate. Also there are great production risks involved. An item partly completed may later have to be destroyed or reworked if flaws should appear or there is error in the machining process. For the first ten months of 1955 the loss from defective products alone was over half a million dollars. During boom times or a war economy period, these factors are of little importance, but throughout a peace economy they are given careful consideration, and they cause one to pause before buying a plant such as that now possessed by Midvale.

Over the past five years, it is pointed out by plaintiffs, Midvale has produced earnings on the average of $820,000 a year. At a continuance of that rate, they argue, the amount which Midvale-Heppenstall will pay for the plant will be amortized in approximately three years.[3] This argument is mathematically correct, but there is no guarantee that the plant will continue to operate at a profit in the future. If the present trend is any indication, it will not do so, at least not as much as $820,000. The main source of its profits in past years has been from defense contracts. There is no sign that they will be forthcoming in the years to follow; yet it will be required to maintain and keep in operating order the facilities on its land until 1966.

■■■ There may be some group acceptable to the Government, which would be willing to pay a higher price for Midvale's assets. So far no such group has appeared on the scene. A Delaware Court of Chancery would not hold up this sale to await a higher bidder, for the majority stockholders and the directors are not required to sell to the highest bidder. All that is necessary is that the price be reasonable. Taking all the factors into consideration we cannot say that the disparity between the book value of the land, plant and equipment and the allocation of that portion of the purchase price to those items is so great as to indicate on the part of the directors and majority stockholders of Midvale a reckless indifference to the whole of the stockholders.

In passing we might add that even at this so-called absurdly low price, Midvale-Heppenstall would not have entered into the Purchase Agreement alone if it did not have the assurance that Allis-Chalmers Manufacturing Company, General Electric Company and Westinghouse Electric Corporation, industrial users of Midvale's products, would buy shares of that corporation in the amount of $6,000,000, thus sharing the risk involved in the purchase of the assets of Midvale.

The second action, Florence W. Brill et al. v. The Midvale Company et al., is both a stockholders' action and a derivative action. It was brought by stockholders of both Midvale and Baldwin against Midvale, Baldwin, Midvale-Heppenstall, The Heppenstall Company and the executive officers of Midvale and Baldwin. The purpose of the action, as hereinbefore indicated, is to enjoin the

3.  Cf. Schiff v. RKO Pictures Corp., Del.Ch.1954, 104 A.2d 267.

sale of Midvale's physical and operating assets pursuant to the Purchase Agreement of December 2, 1955. The complaint asserts three causes of action. This court has jurisdiction of the subject matter in this action by virtue of diversity; it also has jurisdiction over the third cause of action because it arises under an Act of Congress protecting trade and commerce against restraints and monopolies.

The basis of the first cause of action is that "the officers and directors of Midvale have not made proper or diligent efforts to obtain the best price obtainable for the assets of Midvale." The allegations of the complaint under the second cause of action are to the effect that the sale of Midvale's assets pursuant to the Purchase Agreement will cause those assets to be dissipated, wasted and sold for a grossly inadequate and unfair consideration. The third cause of action is brought under the Federal antitrust laws, 15 U.S.C.A. § 1 et seq., on the ground that the transfer of Midvale's assets to Midvale-Heppenstall will violate sections 1 and 7 of the antitrust laws, 15 U.S.C.A. §§ 1, 18.

*First.* As for the first cause of action, it has not been shown that the directors of Midvale have not made proper or diligent efforts to obtain a fair and adequate price for Midvale's assets. On the contrary, it has been shown that the directors did make efforts to obtain a fair and adequate price and that this effort was made over a period of two years prior to the Purchase Agreement. The board of directors are not required to seek the best price obtainable. But even if they were, there has been no evidence to the effect that they turned down a better offer or that one exists.

*Second.* Concerning the second cause of action, we have heretofore concluded that the price was fair and adequate. That conclusion disposes of the claim made under this cause of action.

*Third.* With respect to the third cause of action, defendants have filed a motion to dismiss. The ground for the motion is that the complaint under this cause of action fails to state a claim against defendants upon which relief can be granted in that "(1) Plaintiffs whose only interest is that of shareholders in Midvale and/or Baldwin have no standing to seek an injunction against alleged violations of the antitrust laws, and (2) Even if plaintiffs have standing to sue under the antitrust laws, the third cause of action sets forth no facts on the basis of which any violation of the antitrust laws could now or hereafter be found as against Midvale and/or Baldwin."

The pertinent paragraphs of the complaint under the third cause of action are as follows:

"42. Midvale is and for several years was one of the largest producers of * * * forgings and castings. It is and for many years has been in active competition with other producers in the sale of such products, including Heppenstall, similarly a producer of heavy duty steel forgings and castings.

"43. In conjunction with the sale * * * Westinghouse, G. E. and Allis-Chalmers, * * * have agreed to subscribe to preferred stock in Midvale-Heppenstall in a sum sufficient and necessary to finance that corporation's purchase of Midvale's operating assets.

"44. The overall arrangement further provides that Heppenstall will be the sole common stockholder of the new company, Midvale-Heppenstall.

"45. The heavy duty steel forgings and castings producing facilities of Heppenstall and of Midvale will thus be combined under concentrated control.

"46. The consummation of the proposed sale of Midvale's assets to the new company, Midvale-Heppenstall, will thus result in a reduction of competition and a restraint of trade * * *."

In substance these averments, which we must assume to be true for the

purposes of the motion, state that the very transfer of Midvale's assets to Midvale-Heppenstall will constitute a violation of the antitrust laws. We think that it can be shown under the allegations of the complaint that Midvale and its directors are conspiring with Midvale-Heppenstall, Heppenstall and others to restrain trade or to create a monopoly, and that the transfer of the assets in question to Midvale-Heppenstall will be an act in furtherance of that conspiracy.

The first question posed by the motion to dismiss is whether a court, in a stockholder's derivative action, will enjoin conduct which will be in violation of the antitrust statutes. No case directly in point has been brought to this court's attention, nor are we able to find one. Our attempt to seek a solution to the problem begins with section 16 of the Antitrust Act, 15 U.S.C.A. § 26. Under that section, it will be seen, any person may seek injunctive relief for a violation of the Act. However, with respect to a stockholder's action one must keep in mind the striking difference between a stockholder suing for an injury in his own right and one where he brings the suit on behalf of the corporation in a derivative action. Where he sues personally and on behalf of other stockholders, he is interested in his personal bank balance, not in the financial condition of the corporation. The injury he claims is ordinarily diminution in the value of his stock, and the action he brings is usually called a stockholder's private suit. Here the plaintiffs claim both privately and derivatively, alleging not only that they themselves have been injured but that their corporations have been likewise damaged.

If we examine the case law with respect to stockholder's private suits for treble damages under the antitrust statutes, it will be found to be fairly well settled that such a suit will not be allowed. Continental Securities Co. v. Michigan Central Railroad, 6 Cir., 1926, 16 F.2d 378, certiorari denied 274 U.S. 741, 47 S.Ct. 587, 71 L.Ed. 1320; General Investment Co. v. New York Central Railroad Co., 6 Cir., 1928, 23 F.2d 822, certiorari denied 277 U.S. 588, 48 S.Ct. 436, 72 L.Ed. 1001. For if a stockholder were allowed to recover in the private action any later recovery by the corporation would be diminished and the stockholder would have taken precedence over the creditors of the corporation. The stockholder cannot claim the benefit of limited liability and also the benefit of private recovery when the corporate entity is damaged. Ames v. American Telephone and Telegraph Co., C.C.D. Mass.1909, 166 F. 820.

When we look back from the time Fanchon & Marco, Inc., v. Paramount Pictures Corp., 2 Cir., 1953, 202 F.2d 731, was decided in search of the right of a stockholder in a derivative action, we find that such an action, by historical accident,[4] could not be maintained either in law or in equity. In Fleitmann v. Welsbach Street Lighting Co., 1916, 240 U.S. 27, 36 S.Ct. 233, 60 L.Ed. 505, the plaintiff alleged that the defendants had control of his corporation, and in violation of the antitrust laws, thoroughly ruined it. However, it was held that a derivative action in equity for treble damages was not possible since it would destroy the defendant's right to a jury trial. In United Copper Securities Co. v. Amalgamated Copper Co., 1917, 244 U.S. 261, 37 S.Ct. 509, 61 L.Ed. 1119, Justice Brandeis, writing the opinion of the Court, held that a stockholder's derivative suit could not be brought at law and stated that the derivative device was purely equitable. These cases apparently closed the doors to derivative actions for treble damages under the antitrust laws. Even though to date this result has never been reconsidered by the Supreme Court of the United States, Judge Clark in the Fanchon & Marco case, supra, in relying on the Federal Rules of Civil Procedure, permitted a stockholder's antitrust derivative action

---

4. See Koster v. (American) Lumbermens Mutual Casualty Co., 1946, 330 U.S. 518, 522, 67 S.Ct. 828, 91 L.Ed. 1067.

to be brought for the first time. In so doing he was well aware of both the Fleitmann and the United Copper Securities Co. cases. If Fanchon & Marco is the law, and we think it is, it should follow that a stockholder, in a proper case, should be able to bring a derivative action seeking injunctive relief from threatened violations of the antitrust laws.

While the defendants press upon the courts for consideration in opposition of the above ruling mainly three cases, to wit, General Investment Co. v. New York Central Railroad Co., 6 Cir., 23 F.2d 822; Continental Securities Co. v. Michigan Central Railroad Co., 6 Cir., 16 F.2d 378, and Ashwander v. Tennessee Valley Authority, 1936, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688, we do not consider them decisive of the question here posed. In the General Investment Co. case the plaintiff filed its bill to restrain the pending consolidation of two railroad companies "on the ground that, if completed, it would endanger plaintiff's interest as a stockholder in each of them substantially as set forth in the present bill." [23 F.2d 823.] Here, as the Court pointed out, while it was a suit in equity for an injunction against threatened loss or damage to the complainant by violation of the antitrust laws, the right did not extend to a stockholder where the threatened loss was not to him directly but to the corporation. While this case along with Continental Securities and Ashwander cases may suffice as an answer to the right of the stockholder suing in his own right, they are no answer to the main contention of a person, as plaintiffs here, who are suing in a derivative action on behalf of the corporation.

However before one is entitled to equitable relief under § 16 of the Antitrust Act [5], 15 U.S.C.A. § 26, he must show first that the defendant has violated the antitrust laws, and second, that he is threatened with loss or damage as a result of that violation. Bedford Cut Stone Company v. Journeymen Stone Cutters' Association of America, 1927, 274 U.S. 37, 54–55, 47 S.Ct. 522, 71 L.Ed. 916; Schwartz v. General Electric Co., D.C.S.D.N.Y.1952, 107 F.Supp. 58. In the case before us it is assumed that the defendants are violating and will continue to violate the antitrust laws. The threatened harm is stated by paragraph forty-eight of the complaint to be as follows: "The consummation of the agreements herein described would constitute violations of the said Sections [antitrust laws], and would therefore subject the corporations Baldwin and Midvale, of which the plaintiffs are stockholders, to liabilities for such civil damages and criminal prosecutions."

Private antitrust actions are not founded upon the mere circumstances of a conspiracy in restraint of trade, but upon injuries that would directly or proximately result from the commission of the act in violation of the antitrust laws. Story Parchment Company v. Paterson Parchment Paper Company, 1931, 282 U.S. 555, 566, 51 S.Ct. 248, 75 L.Ed. 544; Chiplets, Inc., v. June Dairy Products Co., D.C.1953, 114 F. Supp. 129, 143. "He must show that he is within that area of economy, which is endangered by a breakdown of competitive conditions in a particular industry. Otherwise he is not injured 'by reason' of anything forbidden in the antitrust laws. Such a construction is in accordance with the basic and under-

---

5. This section provides: "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws * * * when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity * * * and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue * * *."

lying purposes of the antitrust laws to preserve competition and to protect the consumer. Recovery and damages under the antitrust law is available to those who have been directly injured by the lessening of competition and withheld from those who seek the windfall of treble damages because of incidental harm." Conference of Studio Unions, v. Loew's Inc., 9 Cir., 1951, 193 F.2d 51, 54–55. Also see Beegle v. Thomson, 7 Cir., 1943, 138 F.2d 875; Sunbeam Corporation v. Payless Drug Store, D.C. N.D.Cal.1953, 113 F.Supp. 31, 42; Ring v. Spina, D.C.S.D.N.Y.1949, 84 F.Supp. 403, 406. In sum the injury which the laws envision is the injury to the economy of the plaintiff, by virtue of restrictions of trade or something that proximately flows from it, in the competitive field in which it is engaged when the illegal act is committed.

In our case Midvale is going out of the business of producing iron and steel products. It intends to go into the investment business. It therefore can sustain no threatened harm or damages within the meaning of § 16 of the Antitrust Laws, 15 U.S.C.A. § 26. The money which Midvale or Baldwin may, in some future time, be required to pay as treble damages or penalties as the result of possible actions brought against them for violations of the antitrust laws, is not threatened harm or damages which proximately flow from the violations within the meaning of Section 16.

We come now to a consideration of whether or not the complaint asserts a cause of action for which a Pennsylvania Court would grant injunctive relief. It is claimed that the sale of the assets will violate the Federal antitrust law and is therefore ultra vires. Since the acts herein complained of are primarily acts which only a federal court could take jurisdiction of (General Investment Co. v. Lake Shore & M. S. Railroad Co., 1922, 260 U.S. 261, 286, 43 S.Ct. 106, 67 L.Ed. 244) a Pennsylvania court would hold that redress if any would have to be relegated to the federal court under the antitrust laws. If it be contended that the acts alleged in the complaint contravene Delaware law, irrespective of the antitrust violations, acts which would exist though no antitrust laws had been enacted, Clayton v. Farish, 191 Misc. 136, 73 N.Y.S.2d 727, 740, suffice it likewise to say they are not set out in the complaint and further those asserted have been ruled upon as not violative of Delaware law, Gomberg v. Midvale, in this opinion.

Accordingly, plaintiffs' prayer for a final injunction in civil action No. 20,-012, and plaintiffs' prayer for a final injunction under the first and second causes of action in civil action No. 20,019 will be denied; and defendants' motion to dismiss the complaint with respect to the third cause of action will be allowed.