December 7, 1977

## 77-67   MEMORANDUM OPINION FOR THE GENERAL COUNSEL OF THE DEPARTMENT OF COMMERCE

### The Disclosure of Documents to the House Committee on Government Operations—Boycotts—Export Administration Act

This is in response to your request for the opinion of this Office on the legal basis for your Department's refusal to provide to a subcommittee of the House Committee on Government Operations certain documents relating to the antiboycott amendments to the Export Administration Act. It is our understanding that, while your Department has provided the subcommittee with much of the information requested, it felt constrained to withhold documents containing communications from foreign governments, notes of meetings with foreign government officials, and documents from other Agencies containing comments on proposed regulations implementing the Export Administration Act. You have offered, however, to provide the subcommittee with detailed summaries of all these documents, and, in addition, have offered to allow the subcommittee chairman to inspect the original documents under certain conditions. Under these circumstances, we believe that, upon a proper authorization by the President, the documents may be legally withheld from the Congress.

Our conclusion is founded on the proposition, as stated in the Supreme Court's opinion in *United States* v. *Nixon*, 418 U.S. 683 (1974), that the executive branch may, as a matter of constitutional law, decline to reveal information in certain instances where such action is necessary to the performance of the Executive's constitutional responsibilities. While the decision in *Nixon* was rendered in a context involving a grand jury subpoena, as opposed to a congressional request, the Court's rationale indicates that it would, at least in certain situations, uphold the Executive's authority to decline to disclose information to Congress. One factor the Court relied on—that of the principle of separation of powers—is certainly applicable in cases involving congressional requests; such requests, no less than a grand jury subpoena, can infringe

on the "independence of the Executive Branch within its own sphere." *Id.,* at 706. Similarly, the other factor underlying the court's decision— the need for confidentiality of communications between high Government officials and their advisers—can be undermined just as much by a congressional request as by a subpoena from the grand jury.

While the Executive's authority to decline to disclose information to Congress has not been a subject of extensive litigation, the cases decided thus far are in accord with our construction of *Nixon.* In *Senate Select Committee on Presidential Campaign Activities* v. *Nixon,* 498 F. 2d 725, 731 (D.C. Cir. 1974), the court of appeals held that a generalized claim of confidentiality operated to preclude the need to respond to a congressional subpoena, at least in the absence of a showing that the subpoenaed evidence was "demonstrably critical to the responsible fulfillment of the Committee's functions." The *A.T. & T.* case [*United States* v. *American Telephone & Telegraph Company,* 419 F. Supp. 454 (D.D.C. 1976), *remanded for further efforts at settlement,* 551 F. 2d 384 (D.C. Cir. 1976), *remanded for further efforts at accommodation,* No. 76–1712 (D.C. Cir. 1977)], further supports this proposition. While the court of appeals has not reached a final decision in favor of either the Executive or Congress, its opinion leaves no doubt that congressional subpoenas do not peremptorily override the Executive's duty to maintain the confidentiality of information the disclosure of which would be damaging to the national interest.

Of course, the fact that the Executive may at times refuse to disclose information to the congress does not necessarily mean that it may do so in this instance. Rather, the justification for withholding information here must depend on whether the particular information at issue is subject to legitimate claims of confidentiality. Another factor that the courts might consider relevant is whether Congress' need for the information might be satisfied by means other than compliance with its initial request. We believe that both these conditions are met here.

There seems little doubt that the information requested by the subcommittee is the sort generally subject to legitimate claims of confidentiality by the executive branch. The subcommittee, first, has requested communications from foreign governments and notes of meetings with representatives of foreign governments. It is our understanding that the statements made by the foreign governments were given under a pledge of confidentiality, either explicit or implicit. We also understand that some of the statements, if associated with the particular government making them, could be damaging to that government. The disclosure of these documents by our Government could thus impair our relations with the foreign governments involved, both by breaching a pledge of confidentiality and by releasing information possibly detrimental to the interests of the other governments. The documents accordingly could be properly termed "state secrets," *i.e.,* "matters the disclosure of which would endanger the nation's governmental requirements *or its*

270

*relations of friendship and profit with other nations."* 8 Wigmore on Evidence, § 2212a (McNaughton revision 1961) [emphasis added].

As such, the documents here are of the sort the Executive may protect from disclosure. The courts have long recognized the authority of the executive branch to protect "diplomatic secrets." *See, United States* v. *Nixon, supra,* at 706, 710; *United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. 304, 319-21 (1936); *Republic of China* v. *National Union Fire Insurance Company,* 142 F. Supp. 551 (D. Md. 1956). Mr. Justice Stewart, in commenting on this matter in his concurrence in *New York Times Co.* v. *United States,* 403 U.S. 713, 727, 728 (1971), stated:

> . . . [I]t is elementary that the successful conduct of international diplomacy and the maintenance of an effective national defense require both confidentiality and secrecy. Other nations can hardly deal with this Nation in an atmosphere of mutual trust unless they can be assured that their confidences will be kept.

Furthermore, the courts have recognized that the need for confidentiality may even require the withholding of information from Congress. In commenting on President Washington's refusal to comply with a congressional request for documents relating to negotiations with foreign countries,[1] the Supreme Court stated that it was "a refusal the wisdom of which was recognized by the House itself and has never since been doubted." *United States* v. *Curtiss-Wright Export Corp., supra,* at 320. The same result is also supported by the *A. T. & T.* case, which involves the Executive's efforts to withhold from Congress another form of "state secret."

The other documents in question are interagency communications from the Departments of State and Treasury to the Department of Commerce. We believe that the executive branch can also legitimately refuse to provide these documents to the Congress. The Supreme Court in *Nixon* recognized that there was a "valid need for protection of communications between high Government officials and those who advise and assist them." 418 U.S., at 705. The court in *Senate Select Committee on Presidential Campaign Activities* v. *Nixon, supra,* made clear that this need for confidentiality might be asserted and upheld vis-a-vis the Congress. While both of these decisions were rendered in the context of Presidential communications, in our opinion, the same principle would apply with respect to communications containing the policy deliberations of executive officials at a level below that of the President. The need to protect deliberative communications derives from the need for candor and objectivity in the policymaking decisions of the Government. *See, United States* v. *Nixon, supra,* at 705-6. This need exists not only at the Presidential level, but also at other levels in the

---

[1] The executive branch has on other occasions withheld from Congress information similar to that requested here. *See, e.g.,* instances cited in Kramer & Marcuse, "Executive Privileges—A Study of the Period 1953-1960," 29 Geo. Wash. L. Rev. 623, 667-68, 841-44 (1961).

Government. In other contexts the courts have long recognized the importance of protecting the confidentiality of lower executive officials' deliberative communications. *See, Davis* v. *Braswell Motor Freight Lines, Inc.,* 363 F. 2d 600, 603 (5th Cir. 1966); *Kaiser Aluminum & Chemical Corporation* v. *United States,* 157 F. Supp., 141 Ct. Cl. 38 (Ct. Cl. 1958) (Reed, J.), and so too has Congress. *See* 5 U.S.C. § 552(b)(5); H.R. Rep. No. 1497, 89th Cong., 2d Sess., 10 (1966). We thus believe that the constitutional principle announced in *Nixon* and *Senate Select Committee* can properly extend to lower officials' deliberative communications whose disclosure would harm the decisionmaking process of the executive branch. If the President determines that disclosure would be harmful to the effective functioning of the executive branch, the documents may legitimately be withheld from the Congress.

Of course, the fact that the documents requested may legitimately be withheld from Congress does not mean that the executive branch may refuse completely to cooperate with Congress. The recent *A. T. & T.* decision commands that with respect to requests for state secrets, the Executive must cooperate with Congress in a "concerted search for accommodation between the two branches." Slip op., at 21; *see, also* slip op., at 13. The same would appear to be true with respect to inter-agency policy deliberations. The executive branch's presumptive authority to protect this sort of information is a qualified one, and may be overcome by a showing that Congress' needs may not be responsibly fulfilled without disclosure. *Senate Select Committee on Presidential Campaign Activities* v. *Nixon, supra,* at 730. While no such showing has yet been made in this case, it would seem incumbent on the Executive, in order to ensure that it could protect the documents themselves, that it accommodate Congress' needs through other means, if possible.

We believe that the arrangements proposed by the Department of Commerce in its November 21, 1977, reply to the subcommittee meet the Executive's obligations in this regard. You have advised us that your Department has offered to make available to the subcommittee detailed summaries of all the documents, and that these summaries will place before the subcommittee all of the substantive information it has requested, but in such a way as not to impair our relations with foreign governments or disrupt the decisionmaking processes of the executive branch. In addition, you have offered to allow the subcommittee chairman to inspect *all* the original documents in order to verify the accuracy of the summaries. This proposal should satisfy the subcommittee's needs; it will be furnished with all the substantive information it requested, along with a check by the subcommittee chairman to make sure that nothing is omitted or misrepresented in the summaries. We would note that the court in the *A. T. & T.* case suggested a similar, and even more limited, approach. It proposed there that the executive branch furnish the pertinent subcommittee expurgated documents, and that the subcommittee staff be allowed to select only 10 unedited

memorandums for comparison with the originals.[2] While this suggestion, of course, was founded on the particular circumstances of that case, it does provide guidance as to what the court believed was a reasonable accommodation of both branches' needs.

Finally, we recognize that Congress has recently amended § 7(C) (§ 11360) of the Export Administration Act of 1969 to provide that "any information obtained under this Act . . . shall be made available upon request to any committee or subcommittee of Congress of appropriate jurisdiction." Pub. L. No. 95-52, § 113, 91 Stat. 241. We would note, initially, that it is not entirely clear whether this provision is intended to apply to the materials in question here. In any event, we do not believe that this provision can override the Executive's authority to protect information where such is necessary to the performance of its constitutional functions. For the reasons discussed above, we believe that the documents at issue here may, upon the President's authorization, be lawfully withheld from disclosure to the Congress.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[2] This is out of a total of 217 documents. Another difference between the two proposals is that, in *A.T. & T.*, the court suggested a substitution procedure whereby, upon review and approval by the district court, a particularly sensitive memorandum selected at random might be replaced; no such condition has been imposed by the Department of Commerce here. One other difference is that the court in *A.T. & T.* suggested that the staff be allowed to take notes, while your Department's proposal would not allow this. However, because the notes in *A.T. & T.* are to remain with the Federal Bureau of Investigation or the district court, there is little significant difference between this proposal and your Department's approach.